## STATE V. HALPIN.

1.  Under a statute defining larceny as "the taking of personal property accomplished by fraud or stealth and with intent to deprive another thereof," an indictment alleging that one did unlawfully and feloniously, and by stealth, steal, take, and carry away certain property of another without his consent, sufficiently charges the offense.

2.  In connection with evidence that, on the night of the larceny of wheat, defendant borrowed a wagon for hauling grain, and afterwards returned it with pieces broken off, and a new singletree on it; that the tracks of a wagon in which the grain was taken were followed to a place where it got stuck, and there were found the pieces broken from the borrowed wagon—evidence that from a farm near there a horse, singletree, and shovel were stolen that night, the horse being afterwards sold by defendant, is admissible as part of the res gestæ.

(Opinion filed Aug. 13, 1902.)

Error to circuit court, Brown county. Hon. A. W. CAMPBELL.

John Halpin was convicted of grand larceny, and brings error. Affirmed.

*John H. McCoy* and *Frank Sears*, for plaintiff in error.

*A. W. Burtt*, Atty. Gen., and *John H. Perry*, State's Atty., for the State.

FULLER, J. Omitting formal parts, the information to which the defendant pleaded not guilty, and upon which he was tried and convicted of grand larceny, is written as follows: "That heretofore, to-wit, on the 1st day of October, in the year of our Lord one thousand nine hundred and one, in the county of Brown, in the state of South Dakota, one John Halpin, late of said county of Brown and state of South Dakota aforesaid, did commit the crime of grand larceny, committed as follows,

to-wit: That at said time and place the said John Halpin did then and there unlawfully and feloniously, and by stealth, steal, take, and carry away, of the personal property of J. O. Olson, sixty bushels of wheat of the value of $30.00, without the consent of the owner, contrary to the form of the statutes in such case made and provided, and against the peace and dignity of the state of South Dakota."

The objection that the facts stated in this information do not constitute a public offense was raised for the first time on motion in arrest of judgment, and is now urged as a ground for reversal. While the statute defines larceny to be "the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof," it has been held unnecessary in this jurisdiction to use the exact language of the statute, and an indictment for grand larceny, charging that the defendant "did fraudulently and feloniously steal, take, and carry away" was held sufficient, on the probable theory that the language thus employed is equivalent to the expression, "with the intent to deprive another thereof." Territory v. Anderson, 6 Dak. 300, 50 N. W. 124. Though to some extent informal, we think the information fairly imports all the elements of the crime of grand larceny, and, in ordinary and concise language, contains a statement of the acts constituting the offense, so as to enable a person of common understanding to know what is intended. Comp. Laws, § 7241; King v. State, 44 Ind. 285. The technical word "feloniously," when applied to an act, means that it was done with the intent to commit the crime named in the information. Even where the word "feloniously" was omitted from the information, and the word "steal" was alone employed, in charging the offense

of grand larceny, it was held to sufficiently charge the criminal intent with which the act was committed, and meet the requirements of a statute very similar to ours. People v. Lopez, 90 Cal. 569, 27 Pac. 427.

Omitting certain minor circumstances tending to connect the accused with the crime charged, the action of the jury is based upon the following facts, which, for the purpose of determining the sufficiency of the evidence to justify the verdict, must be considered established: On the 1st day of October, 1901, which was about the time the wheat was stolen, the granary of the prosecuting witness was securely locked, and the bin from which such grain was taken contained about 500 bushels of No. 2 Northern wheat, then worth at the nearest market fully 52 cents per bushel. A day later, on returning to his home from work with a thrashing machine, the owner discovered that his granary had been broken into, and between 60 and 70 bushels of wheat had been stolen from the bin. In addition to showing a reasonably accurate means of estimating the amount of wheat taken from the bin, which originally contained 500 bushels, the witness testified that he has since hauled 380 bushels therefrom to market, and that there are about 50 bushels still remaining in the bin.

That the undisputed evidence is sufficient to enable the jury to determine the amount and value of the wheat taken, there can be no doubt. On the evening of October 1st, just about dark, the defendant borrowed of Mr. Voss, one of his neighbors; a lumber wagon with a double box suitable for hauling grain, and told him that he was going to haul some wheat to market for the purpose of paying some debts. The single-trees on the wagon, when it was borrowed, were old and un-

painted, but the wagon box was newly painted, unbroken, and in perfect condition. When it was returned, one of the front corners of the box was broken off by coming in contact with a projecting clevis bolt, and a new singletree had been supplied for one of the old ones. Concerning the wagon tracks leading from the granary, the prosecuting witness testified as follows: "I followed the course of the wagon next morning—it was too late that day. I tracked it up about two miles, as near as I can judge. It went about three-quarters of a mile west, then angling northwest across the fields. I found the place where the horses became stalled—that is, I found the first place; I found the last place afterwards. This last place was on the northern line of the west side of the southeast quarter of section 23, same township. I was down there with McKee and Fred Smith. He was driving out of the field into the highway; there is a kind of deep furrow ploughed pretty deep, and as the front wheels went into this he got stuck; by the appearances of everything the horses had stood there quite awhile—some length of time, anyway. He had dug away in front of the front wheels, making the raise out of the ditch; he had dug or scratched it out in some way, and got the wagon out. I recognized these pieces (showing witness three pieces of wood,) all three of them. I was present when this biggest piece was fitted in the wagon. It fit perfectly in every respect. Mr. Wismer and Sheriff Thompson were present when these pieces were found. It was on the 11th of October when these two pieces were found. The track from this granary went in a northwesterly direction. He angled towards Groton. He went about a mile west, then nearly half a mile north, and then west again, through the fields: south from my granary about forty rods he

struck a section-line road—a main-traveled road—and he went a mile west on this main road. We could not follow the tracks beyond where he got stalled the second time; the wagon went into the main-traveled road, and it had been traveled too much. The place where we lost the track was one mile north and one and one-half miles west from the granary. There is a section-line road one-half mile east of my place, running north. I found the place where the wagon stalled the second time on October 3d. We found these pieces of wood October 11th. I went over to the Voss wagon to see if these pieces would fit in his wagon, to ascertain who got my wheat."

Elmer Johnson testified in part as follows: "I live on Frank McKee's farm, section 15. I remember finding a place where a team had apparently been stalled, about three-quarters of a mile from where I live, mostly south. I found the place on Sunday, October 6th; found a pile of wheat scattered around; picked up about six bushels. I noticed the ground scratched away from the wheels; the wheat had run out the tail gate of the wagon. It looked as if the horses had stood there for some time; the ground was tramped up where the horses were stand-ing. Most of the place where I live is in pasture. The house and barn are in the pasture. Mr. Wismer had a horse in the pasture—a gray horse." The witness was then asked the following question: "Was that horse taken from that pasture?" To which question the defendant objected on the ground that the same was immaterial and irrelevant, and tends to prove no issue in this case, and which objection was by the court over-ruled, and to which ruling of the court the defendant then and there duly excepted. To which question the witness then an-swered, "Yes." The witness further testified: "The horse

was taken in the night between the 1st and 2d of October. There was also taken that night a halter from my horse in the barn, and a singletree from my wagon in the yard, and also a scoop shovel I had for cleaning the barn. My horse was loose in the barn; I discovered the shovel, halter, and singletree were gone the next morning. I discovered the Wismer horse was gone six or seven o'clock next morning. We found where the pasture fence had been taken down—two posts pulled up and put back again; this was near the south corner."

Frank McKee, after fully corroborating the foregoing witness as to the fact that the horse was stolen, testified: "I saw the place where the wagon had apparently stalled about half a mile south, and a quarter of a mile east, across the northeast quarter of section 22. I first went to this place on the morning of the 11th. It looked as though there had been a team stuck, and where the forward wheels was in a dead furrow it looked as though both weels had been dug out with some instrument, shovel, spade, or sharp stick, and everything was tramped down, and the bottom was all covered with wheat where it had been scraped up in front of the team; it looked as if they had worked quite awhile to get out. On the morning of the 11th, I found these sticks. I found these two larger pieces. I fitted this piece into the bed of the wagon box of Mr. Voss. It was on the Voss place where he lives. The wagon was broken on the left hand corner. The piece fit perfectly in the broken place. At Hunter's sale, 'I got to talking about having a horse stolen, and scoop shovel and whiffletree, and Olson said he had lost some wheat, and Voss was standing by, and said he had loaned his wagon that night to a certain man, and when it came back there was a new whiffle-

tree on in place of the old one, and there was some pieces broken out of the front end of the box; that is what made me go over and look around where I found these pieces."

That the pieces of wood found at the place mentioned, and offered in evidence, belonged to and were a part of the wagon box belonging to Voss, and which the defendant had borrowed, stands proved by the testimony of several witnesses. It was also clearly established by competent testimony that the accused, very shortly after the wheat was taken, sold and delivered the stolen horse to Nels Iverson, a farmer residing in the vicinity of Sisseton, and from whom the horse was shortly thereafter reclaimed by the owner. He told Mr. Iverson that "he came from North Dakota; had rented a farm up there, and was going to Wisconsin to see his folks." On the day following the taking of the wheat, the defendant, in the name of his brother, sold a load of wheat to a dealer at Pierpont, a village easily accessible to the place where the larceny was committed; and concerning this transaction he testified in his own behalf to the effect that the wheat he sold was taken from his brother in settlement of a claim for harvest wages; and in this he was fully corroborated. A piece of hard wood similar to one of the old singletrees on the borrowed wagon appears to have been found with the pieces of wood belonging to the wagon box, and the theory of the prosecution was that the wagon was so heavily loaded with wheat that the team broke a singletree, and became unable to proceed further; that, to extricate the wagon, the horse was taken from the near-hand pasture, together with the singletree, shovel and halter belonging to the man who occupied the premises.

Under the circumstances of this case, the taking of these

distinct pieces of property is as much connected with the offense for which the accused was being tried as the fact of borrowing a wagon, and evidence thereof was clearly admissible as part of the res gestæ. Had the accused, while in the possession of the stolen wheat, called at the premises mentioned, and borrowed a horse, halter, singletree, and shovel with which to dig in front of the sunken wheels, the circumstances of the transaction, though competent testimony, would be no more essential to show the connection of the defendant with the crime charged. These facts reasonably tend to prove the larceny charged and were a part of the system pursued by the accused in taking and carrying away the property mentioned in the information. While he ought not to be convicted of the offense charged on account of the fact that he is guilty of an independent crime, the testimony objected to is so connected with the larceny of the wheat that it bears directly upon the issues raised by the information and plea of not guilty. The case comes clearly within a well-recognized exception to the rule that the evidence of an extraneous crime is inadmissible, and the state had the right to lay before the jury all the facts and circumstances connected with, and tending to establish, the larceny of the wheat. Com. v. Sturtivant, 117 Mass. 122, 19 Am. Rep. 401; Whart. Cr. Ev. 31.

In State v. Folwell, 14 Kan. 105, it was so decided on a similar state of facts, and the court says: "It is true that this evidence tended to prove a distinct felony, and it will readily be seen that it was likely to injure the defendants; but the testimony was essential to show the guilt of defendants on the charge then being charged, and it would be a singular rule of law that a person accused of a grave crime could compel the

exclusion of important and relevant testimony merely by committing two felonies at the same time, or so nearly and intimately connected that the one could not be proven without also proving the other. The testimony was competent, not for the purpose of proving another felony, but as tending to show the guilt of the accused in this case." Although we would be better satisfied with the conviction were the testimony offered on the part of the state uncontroverted, it cannot be said that the guilt of the accused is not sufficiently established by competent testimony, and the verdict of the jury cannot be disturbed on the ground that the evidence is insufficient.

Upon a careful consideration of the whole case, we discover no error that would justify a reversal, and the judgment of the circuit court is affirmed.