# ANN DOSER v. STATE.

No. A -10870.  Feb. 9, 1949.

(203 P. 2d 451.)

Joe Ralls, of Atoka, and Brown, Darrough & Ball, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for defendant in error.

BRETT, J.  Defendant, Ann Doser, was charged in the district court of Atoka county, Oklahoma, by information jointly with Oma Dixon Claunch, Junior, William

Eugene Slussler and Ernest England with the murder in Atoka county of McGraw Edward Streckenfinger on August 21, 1945. The record discloses at the time herein involved the defendant herein, Ann Doser, was 18 years of age, that her accomplices, William Eugene Slussler was 17 years of age, Oma Dixon Claunch, Junior, was 15 years of age, and Ernest England was 14 years of age. It further appears that Claunch and Slussler plead guilty to the charge of murder of Streckenfinger and were sentenced to life imprisonment; that England was tried separately and was found guilty by a jury and his punishment fixed at life imprisonment. The defendant Ann Doser was tried in May, 1946, which trial resulted in a hung jury. The second trial, from which this appeal was perfected, resulted in a verdict of guilty and the fixing of punishment at life imprisonment in the penitentiary at McAlester, Oklahoma.

The record is more than 600 pages long. It discloses that some time during the year 1944, while residing in Nicoma Park, a suburb of Oklahoma City, with her mother and stepfather, Ann Doser made a trip to Austin, Texas, where she was employed in the Austin State Hospital as a psycopathic nurse from August 16 to August 31, 1944. It was during this time she first met Slussler and his family for whom she worked a short while. Thereafter, she returned to Oklahoma City and remained until the early part of August when she determined to again return to Austin, Texas. On August 8, 1945, she arrived in Austin where she sought to obtain employment as a telephone operator, but not being in possession of a birth certificate her employment as such was delayed, and in fact never consummated. The record further discloses she endeavored to get employment as a waitress, but failed because she had no health certificate

and was without funds to procure the same. Moreover, it appears that during this time she sought financial aid from her stepfather, a Mr. Bill Adams, without success. She became an object of charity and stayed at the home of a Mrs. Epps in Austin until the night before she returned to Oklahoma, which night she spent with a girl friend. During this stay in Austin she met Claunch and England, and that very shortly thereafter she expressed a desire to leave Austin, Texas, and return to Oklahoma City. It was during this trip to Oklahoma City that this tragic incident occurred.

The state predicates its case upon an information charging in substance in words and figures as follows, to wit: That the defendant did in Atoka county, Oklahoma, on or about August 21, 1945, willfully, etc., without authority of law, with premeditated design to effect the death of one McGraw Edward Streckenfinger while acting conjointly and in furtherance of a common purpose with Oma Dixon Claunch, Junior, William Eugene Slussler and Ernest England, make an assault with a certain revolver and upon the said Streckenfinger and did fire said revolver into the body of the said Streckenfinger, thereby inflicting certain mortal wounds of which said mortal wounds said Streckenfinger did die as was intended by all of the said parties aforesaid, all as contrary to the form of the statutes, etc. The sufficiency of the information was not questioned. The court's jurisdiction over the defendant and the subject matter was likewise conceded.

The state offered evidence in support of the information to support the theory that the defendant Ann Doser and her accomplices Slussler, Claunch, and England formed a conspiracy, at the suggestion of Slussler, on Thursday night before the murder of Streckenfinger was com-

mitted, to engage in pilfering, burglarizing and marauding and violating the law, not at the time knowing where they were going or what they intended to do; that this expedition culminated in the murder of McGraw Edward Streckenfinger north of the town of Atoka, in Atoka county, Oklahoma.

The state offered evidence by the accomplices Slussler, Claunch and England to show that they and the defendant did burglarize two houses in Austin, Texas. There is conflict between the testimony of Claunch and England with Slussler as to the time when the burglary was committed, whether on Thursday or Friday. There is no conflict between them, however, as to the facts of the burglaries and to the effect that from one of the houses burglarized they obtained a .45 caliber pistol and a long hunting knife and other articles, nor to the effect that Billie Slussler appropriated the .45 caliber pistol to his own use and benefit. There is conflict in the testimony of Slussler and Claunch and England as to who procured the hunting knife. There is no conflict that they appropriated it to their own use and benefit. The state's evidence as to the subsequent events as to the place of occurrence as to the agreement about leaving Austin is in conflict, except as to the proposition that after discussing the matter they determined that it was best for them to get an automobile and to leave. To prove the burglaries committed by the defendant and her accomplices in Austin provided the motive for stealing an automobile, the state proved the boys' prior criminal record. Slussler testified on direct examination he had served 10½ months in the reformatory. He admitted on cross-examination that he had been burglarizing most of his life. Slussler suggested it was best for them to leave Austin, and they all agreed to it, according to the

state's case. Claunch testified on direct examination that he had been in trouble in Texas for burglary, and bicycle theft, that he was then under a suspended sentence until he became 21 years of age for burglary. England admitted on direct examination he had been arrested in Austin about 3 months before his arrest in the case at bar. The defendant's accomplices had all had a brush with the law which apparently they desired to escape, if possible. Moreover, the state's case discloses, as gleaned from the evidence of the defendant's accomplices Slussler, Claunch and England, they did look for an automobile to steal. That they found and did steal a 1939 Oldsmobile car. Slussler found the car with the keys in it, did not know where to find the starter, and that the defendant Ann Doser and Claunch and England pushed the automobile down a grade to get the same started. The evidence of Billie Slussler alone discloses that when they reached the bottom of the hill that he said "This is a stolen car and will come in the Federal and will cost us five years, and if you want to go all right, it don't make me a damn;" that the defendant and Claunch and England did not say anything, and then a little later on he testified he said the same thing again, and no one objected. They took off not knowing where they were going as testified to by all three of the accomplices. The state's case further discloses that they left Austin, Texas, in a southwestwardly direction, went through Fredricksburg, Texas. Late that night they sold the long hunting knife to some kids as testified to by Claunch to obtain gasoline. They got from $1.25 to $2.50 for it. The first night they spent in the car, but just before daybreak they drove the stolen automobile in some tall bushes and slept the rest of the night until daybreak. They then discussed where they were going

and Ann Doser, the defendant herein, said they were going to Oklahoma City where her mother lived, that the defendant's mother worked in a big building there, that her father was on the police force and her uncle had a place where they could stay until the heat blew off the car and they could get another car or keep that one. They testified that Doser said she would tell her mother that they were married, that Billie was her husband, Claunch was his brother and Ernest England was Billie Slussler's nephew. Furthermore, they picked up a hitchhiker who bought some gas but who, seeing the condition of one of their tires and observing that they were driving approximately from 80 to 85 miles an hour, abandoned his transportation. Thereafter they then determined to turn back north to Oklahoma City. While they were on the road Ann and Billie shot the pistol. The second night they stopped 20 miles out of Childress, Texas, where they ran out of gas. They were hungry. They were going to leave the car, take off across the mountains and hunt something to eat, but at this point the defendant Ann Doser did not want to go and wanted Slussler and Claunch to flag somebody down, hold them up and take their car. Before they could do this, however, a farmer and his wife in a pick-up stopped. The farmer pulled them to a filling station, bought them five gallons of gas, took them to his home, where they were fed. The defendant's accomplices testified that during the time they were with the farmer and his wife Ann Doser insisted that Billie rob them; this they did not do. That after having spent the night some 20 miles north of Childress they started driving toward Denison, Texas. They stopped at a farmhouse with the intention of burglarizing the place, when the owner drove up in a big Buick and asked what they were doing. Slussler and England testified that Slussler said they were look-

ing for a Mr. Blackwell. While they were sitting in the car Ann Doser suggested that they rob the farmer because he had a good car, that the ignition key was turned off and that they made it appear as though they were out of gas trying to start the car, that the farmer gave them some gas out of a tractor and they drove on toward Sherman, Texas. Billie Slussler alone testified to the effect that either at Sherman or Childress, Texas, the defendant Ann Doser wanted to forge a check. Oma Dixon Claunch and Billie Slussler testifier that Ann Doser wanted to rob a lone attendant at a filling station where they stopped to get some water. This they did not do and drove on into Denison, Texas. Billie Slussler says they arrived in Denison at 12:15 p.m., Claunch says they arrived at 4:00 or 5:00 p.m., and England says they arrived about 5:00 p.m., all three of them said they drove around for awhile and then determined that they would burglarize some more. (It should be remembered in this connection that it was in the summer time and the days were long.) Slussler says the reason they determined to burglarize was because the car had only second gear and reverse and was jumpy. They were out of money and decided to burglarize to get some, to get something to eat and to go on to Oklahoma City. One of them pointed out a house and Billie Slussler and Claunch stayed in the car, that Ann Doser, the defendant, pulled the screen from the window and the first thing he knew Ann Doser had the door open. Slussler testified he drove up to the top of the hill to watch, that Claunch and England went in with Ann Doser, that within about 20 minutes they returned. Claunch had a .38 caliber Colts Special. pistol, defendant Ann Doser had some jewelry. In this burglary they did not get anything to eat, so they drove on out on the highway

and a tire blew out on the car adjacent to a lake. Here they determined to abandon the automobile because they had already sold the spare tire for five gallons of gasoline somewhere on the road from Austin. It is well to point out here that Claunch testified that they went swimming in the lake. Billie Slussler says they did not go swimming in the lake because there was oil on top of the lake. Here it is admitted by all of them, including the defendant, they walked over the cliff on the road, found a house on the corner and burglarized it. Here they procured some clothes. Slussler forced his way in, followed by Ann, Claunch and England. Here the defendant Ann Doser got a sack and put some food in it with which they made sandwiches. Billie Slussler examined the two guns. He held up the .38 and said "I would be afraid to shoot that," that defendant Ann Doser said "If you ain't got the guts to, let me have it"; that they went back to the automobile. Notwithstanding it had a flat they drove around the lake, stopped and changed clothes. Being unable to drive the disabled automobile they determined to abandon it. The state's case as disclosed by the evidence from the testimony of Slussler, Claunch and England discloses that they had some discussion relative to getting another car. Billie Slussler proposed going into town and getting another one, that the defendant Ann Doser said "Use them guns and get the money and get the car and whatever you need," but didn't want him to go up town to get an automobile, but suggested that they hitchhike a ride with the first driver that came along that would take them in. After getting in with the owner, they should rob him of his money and automobile, strip him naked of his clothes so he could not turn them in until they were four or five miles away. The testimony relative to strip-

ping the driver was testified to by Claunch and Slussler. They testified, further, they walked down the road, and passed a filling station on the road towards the Red River bridge. It was then dark. They flagged down Mr. Streckenfinger, who was driving a Hudson, 2-door cloth top coach. The state's case further discloses they hitchhiked a ride with Streckenfinger. In the front seat with him was a boy by the name of Billie Brister. The defendant and her associates entered the automobile. The defendant Ann Doser, Billie Slussler and Claunch got in the back seat and England got in the front seat to the right of Billie Brister who sat in the middle. They rode in this manner until they reached Durant, where Billie Brister left the automobile. Before reaching Durant the highway patrol stopped Streckenfinger and checked his credentials and it was disclosed that he was a discharged member of the Merchant Marines; that he was on his way home to a point in Kansas. Streckenfinger asked for directions as to how to get to Muskogee indicating that he expected to spend the night there. When Streckenfinger let Billie Brister out in Durant, Ernest England moved into the middle in the front seat, and Claunch got in beside him to his right on the front side, Billie Slussler and Ann continued to occupy the rear seat with Ann to the left and Slussler to her right. The state's case further discloses that thereafter in Durant, Streckenfinger stopped for gas. Moreover, it discloses that while he was in the restroom Ann Doser said, in substance, this is going to be a good haul, or a good pick, with all these pretty clothes. Here, Slussler testified he had a conversation with the defendant, Claunch and England, he stated: "We finally got a ride, he didn't know how far he was going." Ann Doser, he testified, said "He must have money, he came out the army or Merchant Marines * * *, he has got good tires and a good car."

He testified further, that they made it up that he, Billie Slussler, was to tap Junior on the back of the neck as a signal when they were to attempt the hold-up of Streckenfinger. They left Durant then and drove north through Atoka. At the "Y" north of Atoka where the road divides to Oklahoma City and Muskogee, they stopped and consulted a map. Billie Slussler argued with the driver, Mr. Streckenfinger, about the road. He told him he could get to Oklahoma City better, quicker and safer if he would take the road that Billie pointed out. (Apparently the road to Oklahoma City.) After this discussion Streckenfinger took the road that lead to Muskogee. The accomplices Slussler and England testified that the defendant was awake at the "'Y." That they drove some distance about two miles from the "Y" and Oma Dixon Claunch, Junior, asked the driver if he would stop and let him out to use the restroom, to which Streckenfinger said that he would go with him. They estimate the distance from the point Streckenfinger and Claunch got out to go to the restroom until they killed him to be from a mile and a quarter to two miles. When this occurred, according to Slussler and Claunch, defendant giggled; that Streckenfinger and Claunch returned with Claunch preceding him, at which time Claunch said to Billie something about a little farther up the road. England testified that he heard Billie whirl the cylinder of the .45 and Ann Doser the defendant started giggling and somebody "shushed." Slussler testified that when Claunch and Streckenfinger got out of the car "to go to the bathroom" just before the shooting the driver stopped and got out of the car first, Claunch turned sideways and wanted to get him and said "Now." Slussler said that the defendant Ann Doser giggled, and was awake. He said, for a quarter of a mile Claunch kept

looking back at him, that he shot out the right window which was done, and told the driver to pull up; that Claunch said "Pull up. This is a stick-up." That when the shot was fired out of the right window by Slussler with his .45, England got "blowed plumb out of the seat to the bottom of the floorboard," that when Claunch told the driver to pull up, he also said "Stick them up." Somebody hollered "Shoot him, Junior, shoot him, he has got a gun," according to England. According to Claunch he told the driver to "Pull up," and instead of that he stepped on the accelerator. He too heard some one say, "He is going for a gun," and he shot at the driver twice. Slussler testified that when somebody hollered he had a gun that he shot and missed the driver and hit the window thinking he would scare him, but he thought Streckenfinger reached for his gun. The car was travelling 60 to 70 to 75 miles an hour at the time; that Claunch shot and the driver fell. Ann Doser was attempting to grab the steering wheel, the car was swerving and going faster every minute; that Claunch attempted to grab the steering wheel. Slussler says he leaned over to turn off the ignition key, that the seat turned and his arm went down and the .45 this way. (This would put the .45 in the position where if discharged it would have made the .45 bullet wound from the right to the left side of Streckenfinger's chest.) Slussler says that he was going out head first on the right side of the car and that the .45 went off again. The last he saw of the defendant Ann Doser was that she was over the seat trying to get hold of the steering wheel.

Finally, the automobile came to a stop in a field. When it did so Claunch and England piled out of the car and went back to find out what had happened to Slussler. They met Slussler approaching the car and re-

turned to the automobile and they found defendant Ann Doser standing by the car screaming. It is agreed that Slussler slapped her and told her to hush. She said she was shot and he wanted to know who shot her and she said the man in the car. Slussler went around to the driver's side of the car, examined Streckenfinger and found he was dead, searched his body and took his billfold and divided the money between himself, Claunch and England, whom he told to get out of the country, and that he would take Ann Doser to a hospital. Before leaving they kicked out the front lights of the automobile and beat the back lights out with their pistols.

Thereafter, Slussler carried Ann Doser down the road until he could hail a passing truck and took her to St. Mary's Hospital in McAlester where she remained until Wednesday afternoon at 6:00 o'clock, being transferred to St. Anthony's Hospital in Oklahoma City.

The physical examination of Ann Doser discloses that she had been shot in the mouth with a .45, knocking out some upper teeth, tearing out the palate, and emerging in the region of the left temple. Her escape of death, and her recovery was miraculous. An examination of Streckenfinger's body discloses that he was shot in the left side near the left nipple with a .38 which came out near the center of the left side, and either the same or another bullet went through his arm not quite breaking the skin of the left elbow. That a .45 bullet hit Streckenfinger ranging straight across from the right side through his heart and emerging on the left side penetrating the left-hand door of the car. The record further discloses that there was a bullet hole in the glass of the left front door apparently having been made by a .45, and that there was a jagged hole in the left rear cloth top of the automobile around which there was some blood

and pieces of bone apparently made by a .45 as the same emerged from the temple of Ann Doser.

One of the pistols was thrown away and another buried. They were recovered in a subsequent investigation with the aid of Slussler and Claunch. The foregoing is a substantial statement of the state's case.

On the issue of competency and admissibility as raised by the defendant, we are concerned only with the state's evidence. But in order to give the reader of this opinion a better view of the issues of fact confronting the jury we include the following brief but substantial statement of the defendant's case.

Ann Doser's defense in substance was, that she did. want to return to Oklahoma City, and Slussler said he would take her. That this was always their intention. That Slussler had proposed matrimony to her, which she looked on with favor, but said she would have to have her mother's permission. The object of the trip to Oklahoma City was to obtain that permission. She denied having participated in the burglaries, or the larceny of the automobile in which they left Austin. She testified that Slussler told her that the car he had obtained was borrowed from a friend. He told her the .45 caliber pistol belonged to his father. She denies all the statements that she was reputed to have made about robbing any one else between Austin and Denison. She admits she participated in the second burglary at Denison in which she got some food. This she says was prompted by intense hunger. She says when the Oldsmobile broke down, it was her suggestion they hitchhike a ride. She says she wanted Slussler to notify the owner by telegraph or telephone the Oldsmobile was being abandoned, and where. She testified that Slussler said he couldn't do

that—the car was stolen. This she said was her first knowledge of the fact it was a stolen car. She suggested that they hitchhike a ride. She denies any knowledge of a conspiracy to rob the driver, or that she suggested such be done and the driver be stripped naked. Moreover she contends that when the robbery was attempted she was asleep and knew nothing about it until she heard somebody say, "Grab the steering wheel," she awoke, the car was swerving and she grabbed the wheel. She lost consciousness, then came to and got out of the car wounded and screaming. She said she did not know who shot her or when. Furthermore, she denied making the admission testified to by Sheriff L. O. McBride hereinafter set forth. In substance that was her defense.

On these issues of fact this case should have been decided. They present a most difficult question for the jury. The sharp conflict in the testimony makes reconciliation impossible. A jury confronted as this one was must employ all their experience, and knowledge of human nature. In reaching a verdict they have the advantage of confrontation of the witnesses. They can observe them on the witness stand. But even that does not lessen their problem. Either the defendant's accomplices told the truth or they perpetrated one of the most shameful cases of perjury to which a young woman was ever subjected. The record reveals they were vigorous in pressing the case against the defendant. No one can deny that. They asked no quarter and they gave none. It became a case of "Dog eat dog." It is evident that had the defendant not been along, and got shot, this case might now be an unsolved murder mystery. There is an outside possibility that this situation, as an afterthought, may have inspired a peculiar taint of hatred, by the accomplices for the defendant. The defense urges that the

accomplices shot Ann Doser to get her out of the way. This we do not believe. If Slussler had wanted to eliminate her and escape, there was ample opportunity to do so; instead Slussler took her to the hospital and made his escape impossible. Possibly the other boys were animated by hate because Doser disclosed their identity. On the other hand, maybe they determined to tell the truth and Slussler saw the futility of trying to protect Doser in his testimony. To the contrary, either the defendant told the truth or proved herself one of the most artful fabricators of fiction to confront a jury. In the language of the inimitable Will Rogers: "People will believe a lie because it sounds like the truth and they won't believe the truth some times because it sounds like a lie." Such was the confusing dilemma of conflict in the evidence in the case at bar. But with a conflict of the evidence we have no concern, if the evidence was substantial and sufficient to support the verdict. That it is substantial on both sides in the case at bar cannot be denied. But, this court never weighs the evidence, under the conditions herein involved. Chapman v. State, 84 Okla. Cr. 41, 178 P. 2d 638; Sadler v. State, 84 Okla. Cr. 97, 179 P. 2d 479; Peterson v. State, 86 Okla. Cr. 302, 192 P. 2d 286. To weigh the evidence is the responsibility of the jury in any trial. Under such conditions the function of this court, within our power, is to see that the defendant who seeks appellate aid is accorded a fair and impartial trial. It would be a tragic incident, were the defendant compelled to serve a life sentence in the penitentiary, under a penalty forged by perjury. It would be equally unjust for the defendant to escape punishment, upon an ingenious fabrication. To detect perjury is largely within the province of the jury. It is very seldom disclosed from the cold face of the

printed record. The jury believed the defendant's accomplices. Where the jury's responsibility ends, our responsibility begins. It would be a more pitiable situation were the defendant convicted contrary to sound principles of law and fairness which is the constitutional right of every accused. For the foregoing reasons this case is entitled to and has received the earnest consideration of this court.

The defendant's principal objection is to evidence of the commission of the other crimes as delineated by the defendant's accomplices, other than the one charged in the information. She contends that they are in no way related to the charge of murder against the defendant, that they are independent of and disconnected from said charge. This contention is based upon the general rule to the effect that the evidence of other crimes prior to or subsequent to the crime charged in the information or indictment is inadmissible, particularly where the evidence of other specific crimes has no direct relation to or connection with that charged in the information or indictment. The foregoing rule is fundamental. This court has so expressed itself many times. Hall v. State, 67 Okla. Cr. 330, 93 P. 2d 1107, 1116; Starks v. State, 67 Okla. Cr. 156, 93 P. 2d 50; Clark v. State, 66 Okla. Cr. 255, 91 P. 2d 686; Michelin v. State, 66 Okla. Cr. 241, 90 P. 2d 1081, 1082; Janeway v. State, 62 Okla. Cr. 264, 71 P. 2d 130; Brockman v. State, 60 Okla. Cr. 75, 61 P. 2d 273; McCollum v. State, 57 Okla. Cr. 381, 48 P. 2d 872; Quinn v State, 54 Okla. Cr. 179, 16 P. 2d 591, 595; Hughes v. State, 51 Okla. Cr. 11, 299 P. 240; Cole v. State, 50 Okla. Cr. 399, 298 P. 892; Ditmore v. State, 49 Okla. Cr. 228, 293 P. 581; Pearson v. State, 44 Okla. Cr. 19, 279 P. 700; Hill v. State, 41 Okla. Cr. 266, 272 P. 490; Welch v. State, 41 Okla. Cr. 207,

271 P. 172; Perdue v. State, 40 Okla. Cr. 9, 266 P. 514; Wyrick v. State, 37 Okla. Cr. 115, 255 P. 163; Robinson v. State, 36 Okla. Cr. 396, 254 P. 986; Stanfield v. State, 30 Okla. Cr. 82, 235 P. 256; Beach v. State, 28 Okla. Cr. 348, 230 P. 758; Mahseet v. State, 26 Okla. Cr. 176, 223 P. 199; Dumas v. State, 19 Okla. Cr. 413, 201 P. 820; Wisdom v. State, 18 Okla. Cr. 118, 193 P. 1003; Emerson v. State, 18 Okla. Cr. 109, 193 P. 743; Smith v. State, 14 Okla. Cr. 348, 171 P. 341. To this rule, however, there are certain exceptions which are as well recognized as the rule itself. The difficulty arises in applying the exception, in distinguishing what is competent and what is not. Particularly in murder cases, the exception should be applied with great care and caution. As an aid thereto the courts have laid down some excellent tests for the guidance and direction of trial courts. The test that should be applied is most aptly stated in State v. Gregory, 191 S.C. 212, 4 S.E. 2d 1, 4, wherein that court said:

"Whether evidence of other distinct crimes properly falls within any of the recognized exceptions noted is often a difficult matter to determine. The acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced. If it is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime. But the dangerous tendency and misleading probative force of this class of evidence require that its admission should be subjected by the courts to rigid scrutiny. * * * (If) the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt, and the evidence should be rejected."

This court has said in this connection in Michelin v. State, supra [66 Okla. Cr. 241, 90 P. 2d 1083]:

"We realize that this question is of serious import in the trial of criminal cases in this state. Every person charged with the commission of a crime is presumed to be innocent until his guilt has been established beyond a reasonable doubt. That he shall be charged with but one offense, and that he shall not be convicted for the commission of an offense other than the one charged. The court should, therefore, be very careful in drawing the line as to the introduction of this testimony, and in seeing that it comes clearly within the exception to the general rule before it is permitted to be introduced."

To the same effect see People v. Peete, 28 Cal. 2d 306, 169 P. 2d 924.

In Stanfield v. State, supra, 30 Okla. Cr. at page 85, 235 P. at page 257 this court said:

"In the trial of a criminal case the issue is single and the testimony should be confined to the offense charged, and other offenses or prejudicial matter should not be injected, unless in some manner, or under some exception to the general rule, relevant to the case on trial. Smith v. State, 5 Okla. Cr. 67, 113 P. 204; State v. Rule, 11 Okla. Cr. 237, 144 P. 807; Miller v. State, 13 Okla. Cr. 176, 163 P. 131, L.R.A. 1917D, 383."

It seems that the admissibility of evidence as an exception to the general rule in this state is largely based upon the proposition that it must have some logical or visible connection with the crime charged in the information. As was said in the comparatively recent case of Byers v. State, 78 Okla. Cr. 267, 147 P. 2d 185, 188:

"* * * there must be a visible connection between the crimes. Nemecek v. State, 72 Okla. Cr. 195, 114 P. 2d 492, 135 A.L.R. 1149; Pressley et al. v. State, 71 Okla. Cr. 436, 112 P. 2d 809; Landon v. State, 77 Okla. Cr.

190, 140 P. 2d 242; Herren v. State, 75 Okla. Cr. 251, 130 P. 2d 325.

"The fact that one person may commit a similar crime does not justify the admission of the other identical offenses if they are independent of each other. Where the trial court cannot clearly see a visible connection between the alleged other offenses to the one charged, he should refuse to admit the other offenses in evidence. If the trial court is uncertain as to the admissibility of such evidence, he should give the benefit of such doubt to the defendant as it is manifestly unfair to the accused to force him to prepare to defend himself against any collateral crime other than the one charged against him in the information. Juries are too prone, when such other offenses are admitted in evidence, to find an accused guilty of the crime charged merely because he might have committed some other offense."

To the same effect is: Koontz v. State, 10 Okla. Cr. 553, 139 P. 842, Ann. Cas. 1916A, 689; State v. Rule, 11 Okla. Cr. 237, 144 P. 807; Emerson v. State, supra; Davis v. State, 31 Okla. Cr. 109, 237 P. 471; Call v. State, 39 Okla. Cr. 264, 264 P. 643; Riley v. State, 57 Okla. Cr. 313, 49 P. 2d 813; Clark v. State, supra; Pressley v. State, 71 Okla. Cr. 436, 112 P. 2d 809; Brockman v. State, supra. In State v. Rule, supra, when evidence is offered of other crimes other than the one charged in the information as an exception to the general rule, this court went further and said:

"Where evidence is offered tending to prove that the defendant has committed an offense other than that for which he is on trial, good practice requires that the prosecuting attorney should state the purpose for which the evidence is offered, and, if it is admissible for that purpose, the trial court should instruct the jury as to the purpose for which they may consider it."

And we are of the opinion that such instruction should be given at the time the evidence is offered as well as

that it should be covered in the general instructions at the conclusion of the trial. This principle in State v. Rule, supra, was cited with approval in Clark v. State, supra. Every precaution should be taken, particularly in a murder case, to insure that the defendant should be convicted only upon evidence which establishes his guilt beyond a reasonable doubt, and that he be accorded a fair and impartial trial. No person should be convicted of murder merely because of his past bad reputation. Notwithstanding that precaution should be exercised in such cases, this court has admitted evidence of other crimes in murder cases. State v. Foster, 56 Okla. Cr. 170; 35 P. 2d 733; Ditmore v. State, supra; Riley v. State, supra; Janeway v. State, supra; Smith v. State, 83 Okla. Cr. 209, 175 P. 2d 348, (manslaughter); Cole v. State, supra. But has rejected the same where it did not bear some logical connection or relevancy to the offense charged in the information. Quinn v. State, supra; Call v. State, supra; Stanfield v. State, supra (manslaughter). As a general rule evidence of other offenses committed by accused is admissible to show, or when it tends to show, his motive with respect to the offense charged. In the case at bar, there is no question in the court's mind, as to the state's right to show that there was a conspiracy to steal the 1939 Oldsmobile in which to escape and avoid apprehension for the burglaries committed in Austin. According to the state's case, the burglaries committed were the object of the original conspiracy existing between defendant and her accomplices. The burglaries likewise provided the motive for the theft of the 1939 Oldsmobile in which the parties escaped from Austin. The motive for the theft of the automobile as disclosed by the state's case was to go to New Mexico or some other place or somewhere else as testified to by the defendant's accomplices. At the defendant's suggestion it was

ultimately changed to come to Oklahoma City. Moreover, the state's case discloses that the trip to Oklahoma City was objectively for the purpose of avoiding apprehension in connection with the burglaries and the larceny of the automobile until the "heat was off". The breakdown of the 1939 Oldsmobile provided the motive for the suggested robbery of the first man who came along who would give them a ride. When they sought to complete the trip to Oklahoma City by hitchhiking in furtherance of the conspiracy, the things said and done leading up to the attempted robbery of Streckenfinger and his murder, as well as subsequent events forming a part of the res gestae, are all admissible in evidence. It is well here to note that the series of crimes committed by the defendant was the outgrowth of the original conspiracy to burglarize the two houses in Austin, Texas, and that it was a continuing conspiracy from that moment on as revealed by the State's case. All this evidence was admissible. In State v. Foster, supra, this court said in the body of the opinion 56 Okla. Cr. 170, 35 P. 2d 733:

"The rule of law is well settled that evidence of other crimes is competent to prove the specific crime charged when it tends to establish a scheme or plan or as part of a general conspiracy or is a part of the res gestae or shows intent or motive, or where it is so closely linked to the crime for which accused is on trial as to throw light on it. Starr v. State, 5 Okla. Cr. 440, 115 P. 356; State v. Rule, 11 Okla. Cr. 237, 144 P. 807, and authorities therein cited; Quinn v. State, 54 Okla. Cr. 179, 16 P. 2d 591, and authorities therein cited."

Tillman v. State, 82 Okla. Cr. 276, 169 P. 2d 223; Michelin v. State, supra; State v. Halpin, 16 S.D. 170, 91 N.W. 605, cited in Tillman v. State, supra, wherein the court said [82 Okla. Cr. 276, 169 P. 2d 227]:

"In State v. Halpin, 16 S.D. 170, 91 N.W. 605, it was held that in connection with the evidence that on the night of the larceny of wheat, defendant borrowed a wagon for hauling grain, and afterwards returned it with pieces broken off, and a new singletree on it; that the tracks of a wagon in which the grain was taken were followed to a place where it got stuck, and there were found the pieces broken from the borrowed wagon; evidence that from a farm near there a horse, singletree, and shovel were stolen that night, the horse being afterwards sold by defendant is admissible as part of the res gestae."

This court has held that other offenses committed by accused are admissible when the same shows motive with respect to the offense charged. Thacker v. State, 55 Okla. Cr. 161, 26 P. 2d 770, (murder); Cole v. State, supra (a murder case); Ditmore v. State, supra (murder); Smith v. State, supra (murder); Janeway v. State, supra (murder); Spivey v. State, 69 Okla. Cr. 397, 104 P. 2d 263. In Smith v. State, supra, evidence of other offenses is admissible when it is explanatory of the motive or intent of the offender in the commission of the offense charged. We therefore are of the opinion that evidence in relation to the two burglaries in Austin, Texas, is admissible as tending to establish the motive for the theft of the automobile with which to effect the escape of the defendant and her accomplices. Likewise, we are of the opinion that the desire to escape provided the motive for the trip to Oklahoma City and the desire to get to Oklahoma City until the "heat was off" and the breakdown of the 1939 Oldsmobile provided the motive for the attempted robbery and the murder of Streckenfinger. Moreover, where the two crimes are logically related or connected, so that proof of the other tends, or is necessary, to prove the one charged, or is necessary to complete account thereof, as where they are so inseparable as to constitute but one transaction or crime, or where

the extraneous crime forms part of a chain of circumstantial, evidence of guilt of the crime charged the evidence of other crimes is admissible. 22 C.J.S., Criminal Law, § 683, page 1093, Note 68; Spivey v. State, supra; Johnson v. State, 70 Okla. Cr. 270, 106 P. 2d 149, 153 wherein the court said: ·

"It may be regarded as settled that where the offense charged is so connected with the other offenses sought to be proved as to form a part of an entire transaction, evidence of the latter may be given to show the character of the former."

In Borum v. United States, 61 App. D. C. 4, 56 F. 2d 301, at page 303, the court said:

"* * * A collateral or extraneous offense, when it forms a link in a chain of circumstances culminating in the offense charged, may properly be shown in evidence, and it is, therefore, the universal rule that testimony connecting a defendant with a different crime than that charged is admissible if it is so related to or connected with the crime charged as to establish a common scheme or purpose so associated that proof of one tends to prove the other, which is to say that where the two crimes are so connected as to be part of a general scheme, the evidence is admissible. The ground on which such evidence is allowed is that both crimes are connected with a single purpose and in pursuance of a single object. In such cases proof of the first is admissible to show a motive for the second."

On the basis of the foregoing logic proof of the burglaries at Austin provided the motive for the larceny of the 1939 Oldsmobile. Here, the desire to get away from Austin and come to Oklahoma City "until the heat was off" was the single purpose providing the motive, after the breakdown of the 1939 Oldsmobile for the robbery of Streckenfinger, which incidentally resulted in

his murder. In Janeway v. State, supra, this court said [62 Okla. Cr. 264, 71 P. 2d 131]:

"* * * That evidence of other crimes is competent to prove the specific crime charged when it tends to establish a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or to connect the defendant with the commission of the crime charged."

In Ellis v. State, 22 Okla. Cr. 11, 208 P. 1051, the court said:

"To our mind this was one inseparable transaction, and the evidence of the whole transaction was permissible as a part of the res gestae, * * *."

The conclusion is inescapable that, from the time the parties conspired to steal the 1939 Oldsmobile and leave Austin in the stolen automobile and determined to come to Oklahoma City, their purpose was single. The objective of this ill-fated excursion was to get to Oklahoma City and, so to speak, "hole up" until the heat was off of the burglaries they had committed in Austin, Texas. Evidence of the other crimes would be admissible for another reason. Since the automobile was the unlawfully possessed instrument by which the object of the conspiracy was to be attained, evidence of its acquisition was a proper matter of inquiry. In Birkes v. State, 27 Okla. Cr. 350, 227 P. 895, this court was confronted with the same situation relative to a stolen automobile used in an attempted robbery which resulted in a homicide. Therein this court said:

"Evidence of the theft of an automobile used by the defendants in conveying themselves to the bank where the homicide occurred, and later used in their attempt to escape from the scene of the crime, was admissible,

notwithstanding the fact that such evidence showed that another crime had been committed by the defendants."

In the body of the opinion the court said 27 Okla. Cr. at page 351, 227 P. at page 896:

"The defendant complains that the court erred in permitting proof of the stealing of the automobile just prior to the attempted robbery and the homicide. The proof shows that this automobile was taken by force from two young men a short time before the attempted robbery of the bank; that the bandits used this car to convey themselves to the bank, and afterwards used it again in their attempt to get away from the scene of the crime. The evidence was admissible as explanatory of the commission of the crime charged, notwithstanding the fact that the proof showed that another crime had been committed by the defendants. Vickers v. United States, 1 Okla. Cr. 452, 98 P. 467; Littrell v. State, 21 Okla. Cr. [466], 208 P. 1048."

See, also, Johnson v. State, supra.

The same rule applies relative to the possession of the .45 and the .38 pistols obtained in the burglaries and used to murder Streckenfinger.

In People v. Rogers, 71 Cal. 565, 12 P. 679, it was said:

"On the trial of an information for murder, evidence of the commission of two burglaries by the accused is admissible, notwithstanding the rule that such evidence is objectionable as, in effect, trying the accused for an offense not charged in the information, and as prejudicing the jury against him, when the evidence tends to show that the person who killed the deceased gained entrance to his house by means of a knife and chisel taken in one of the burglaries, and killed him with a pistol taken in the other."

See People v. Booth, 72 Cal. App. 160, 236 P. 987, 989.

Moreover, we are inclined to believe that the owner-ship and possession by the defendant and her accomplices ranging in age from 14 to 18 years of loaded .45 and .38 caliber pistols at any time would be a proper matter of inquiry. But, under the circumstances herein involved, the question of ownership and possession has a logical, material and visible connection with the killing.

Furthermore in relation to the two burglaries committed in Denison, Texas, preceding the robbery and murder of Streckenfinger, the defendant admitted her participation and guilt in the second burglary. Evidence of this crime was admissible to prove guilty knowledge on the part of the defendant. Conceding that she had no guilty knowledge up to that time, which the state's case was designed to completely disprove, if she was not a party to the conspiracy up to the time of the second Denison burglary, she became an admitted party then. This would tend to make her a party to all the acts done before or after in furtherance of the common design. Fitzgerald v. State, 85 Okla. Cr. 376, 188 P. 2d 396. This court has repeatedly held that evidence of other crimes committed is admissible as throwing light upon the guilty knowledge of the defendant in the crime charged in the information. Stark v. State, supra; Nemecek v. State, 72 Okla. Cr. 195, 114 P. 2d 492, 135 A.L.R. 1149; Tillman v. State, supra.

Moreover, the defendant contends that the suggestions, statements and declarations allegedly made by the defendant, such as that they should rob their benefactors who bought them gasoline and fed them, and that they should rob a filling station operator as well as the man who drove up in a big Buick and gave them gas out of his tractor, and that they rob the first man that gave them a ride, strip him of his clothes so that he would

be unable to make an immediate report of the robbery, are inadmissible. In Hollingshead v. State, 21 Okla. Cr. 306, 207 P. 104, this court said:

"After a conspiracy is shown to exist all acts of the conspirators in furtherance of the conspiracy, and all declarations of the conspirators, or any of them touching upon the subject of the conspiracy before the object of the conspiracy is consummated or its purposes abandoned, are competent against the one on trial."

In Davis v. State, supra, it was said [31 Okla. Cr. 109, 237 P. 474]:

"Proof of the commission of a particular crime charged cannot be made by proving the commission of some other similar but disconnected offense, but the testimony of the witness is of statements made by defendant in the presence of, or to, his codefendants. It was not proof of a separate crime or a proposed crime, but proof of the organization of the conspiracy, of defendant's connection with it, and the intent of the parties."

In Spivey v. State, supra, it was said [69 Okla. Cr. 397, 104 P. 2d 265]:

"Where several persons having united for an illegal purpose, any act done by one of them, or any of them, or any declaration made touching the prosecution of the common purpose or design, being regarded as the act of all, is admissible against all or any of the conspirators."

On the basis of these authorities we are of the opinion that the statements made by the defendant herein on the trip from Austin can only be regarded as made in furtherance of the object of the general conspiracy to get to Oklahoma City in stolen automobiles, and to procure means therefor. Such suggestions, statements or declarations were indicative of the strength of the motive and determination of intent.

For all of the foregoing reasons we are of the opinion that the evidence in relation to the burglaries at Austin involving the .45 caliber pistol and the long hunting knife, larceny of the 1939 Oldsmobile automobile as well as matters and things that transpired after the parties left Austin, such as declarations made and acts done intended to and designed to further the object of the conspiracy to get away from Austin and to get to Oklahoma City, where they could, so to speak, "hole up"; the breakdown of the automobile in Denison, Texas, the burglaries committed in Denison, the acquisition of the .38 caliber pistol, the plans made to obtain the second automobile incident to hitchhiking the ride with Streckenfinger, the attempted robbery of Streckenfinger and his murder and the things said and done thereafter in connection with his murder, and any voluntary statements made by the defendant in the hospital, and the things done by the defendant and her accomplices in the solution of the murder after their apprehension and arrest, are all admissible. This evidence tends to prove the existence of, first, the conspiracy to commit the burglary; second, the conspiracy to escape and to avoid apprehension; third, the conspiracy to procure a second automobile and the acquisition and use of the pistols incident to the robbery and murder of Streckenfinger; all growing out of the burglaries committed in Austin, Texas, which was the motive behind the motive, constituting a single transaction or chain of circumstances leading up to the attempted robbery and murder of Streckenfinger, for the single purpose, to wit, to get to Oklahoma City until the "heat was off."

The second contention of the defendant is though she did not put her character in issue the state was permitted to offer proof, through her alleged accomplices

Slussler, Claunch and England, that she was a person of very low morals and character. This contention is based upon the alleged statements by the defendant as to proposed crimes and criminal associations before they left Austin and not in furtherance of a single purpose of the conspiracy. We have hereinbefore disposed of the statements made in furtherance of the conspiracy. In addition to that evidence, however, the state was permitted to offer proof of declarations, statements and acts in no way connected therewith. The substance of the evidence was as follows: That before defendant Ann Doser left Austin with her accomplices on the trip to Oklahoma City, Slussler took her in an automobile to meet a man in San Antonio, Texas; that she stayed there all night and returned the next day. Unexplained as it was this would lead to the logical conclusion that the trip to San Antonio was made for an ulterior purpose. In addition thereto, her accomplices were permitted to testify that "she liked guys with plenty of guts," and that she wanted to go with Slussler to Houston, Texas, where together they would blackjack soldiers. She would contact them in honkey tonks, toll them outside, and he and Junior would "highjack" them. In addition thereto, that she wanted to leave England out of this plan because he talked too much. She was trying to start a gang in Austin; that the reason she had not already done so was because she was afraid the other boys she had been associating with would say something to the police about it. The state was permitted to offer proof she had been run out of Houston for peddling dope and wanted to organize a dope gang in Austin. Moreover, that on one occasion Ernest England went to Ann Doser's apartment and that Ann got up and put some clothes on and England saw a man lying across the bed

asleep. Ann was always telling them how bad she was and what an expert she was in crime. Furthermore, that Ann Doser was profuse in the use of profane language; that Slussler had heard a lot of cursing in honkey tonks and that she was the worst he had ever heard. Also, that the defendant was in trouble other than in the participation in the burglaries. All of the foregoing evidence was absolutely incompetent for any purpose. It could only have been offered to destroy the character of the defendant which was not then in issue. It threw no light whatsoever upon the single purpose of the trip from Austin, Texas, to Oklahoma City. In Pressley v. State, supra [71 Okla. Cr. 436, 112 P. 2d 815], this court said:

" ' "It is a fundamental principle of criminal law that the character of the defendant cannot be impeached or attacked by the state, unless he puts his character in issue by introducing evidence of good character. Kirk v. State, 11 Okla. Cr. 203, 145 P. 307." '

- "In Jones v. State, 20 Okla. Cr. 154, 201 P. 664, 670, this court held: 'It is not admissible to show the bad character of defendant until after the defendant himself puts his good character in issue. * * * The rule as above stated has received the judicial sanction of the courts of this country for more than a century. Underhill on Evidence, § 82; 1 Wigmore on Evidence, p. 233; 10 R.C.L. 953; Porter v. State, 8 Okla. Cr. 64, 126 P. 699; Corliss v. State, 12 Okla. Cr. 526, 159 P. 1015.' * * *"

In the case of Duggins v. State, 76 Okla. Cr. 168, 135 P. 2d 347, 351, this court said in the body of the opinion:

"There are two other errors shown in the record which would have been sufficient to have required a reversal of this case, towit: the effort of the county attorney to prove the bad reputation of defendant when the defendant had not placed his reputation in issue by offering

evidence of his good reputation. Porter v. State, 8 Okla. Cr. 64, 126 P. 699; Morris v. State, 26 Okla. Cr. 399, 224 P. 377; Martin v. State, 29 Okla. Cr. 136, 232 P. 966."

In the case of Lizar v. State, 74 Okla. Cr. 368, 126 P. 2d 552, 555:

"It is a fundamental principle of criminal law that the character of the defendant cannot be impeached or attacked by the state, unless he puts his character in issue by introducing evidence of good character. Porter v. State, 8 Okla. Cr. 64, 126 P. 699; Whitlow v. State, 24 Okla. Cr. 307, 218 P. 162; Holleman v. State, [74 Okla. Cr. 258], 125 P. 2d 239, decided April 23, 1942.

"There could be nothing more dangerous than to place a man upon trial for the violation of some specific statute and then allow the prosecution, upon some slight pretext, to allow a witness to make the general statement that for the past twelve years he and the defendant had stolen cattle twenty or twenty-five times, and had stolen other things together. Regardless of the guilt or innocence of the accused of the offense with which he stands charged, no man would be acquitted in the face of such testimony as this, if believed by a jury, as the average juror would conclude that if a man had stolen that many times he should be punished even though he might be innocent of the offense for which he is being tried."

That it is reversible error to permit the state to attack the defendant's reputation unless and until defendant puts it in issue by offering evidence of his good reputation has been sustained in the following cases: Smith v. State, 75 Okla. Cr. 55, 128 P. 2d 250; Cantrell v. State, 12 Okla. Cr. 534, 159 P. 1092; Harris v. State, 39 Okla. Cr. 4, 262 P. 700; Bruner v. State, 44 Okla. Cr. 425, 281 P. 319; Johnson v. State, 52 Okla. Cr. 76, 2 P. 2d 972; Giles v. State, 55 Okla. Cr. 145, 28 P. 2d 600; Byars v. State, 15 Okla. Cr. 308, 176 P. 253; Scott v.

State, 13 Okla. Cr. 225, 163 P. 553; Reams v. State, 12 Okla. Cr. 363, 157 P. 273; Rogers v. State, 8 Okla. Cr. 226, 127 P. 365; Watson v. State, 7 Okla. Cr. 590, 124 P. 1101; Salyer v. State, 25 Okla. Cr. 433, 221 P. 118; Upton v. State, 12 Okla. Cr. 593, 160 P. 1134. The foregoing evidence was highly prejudicial and it should not have been permitted and constitutes reversible error.

The defendant next contends that the court erred in permitting attorneys for the state to ask defendant on cross-examination with regard to many irrelevant, incompetent and immaterial matters concerning which she had not given testimony in chief which in effect were designed to degrade the defendant.

The matters complained of were such questions as to when her mother and father were separated and whether they were divorced, as to how long she had been living with her mother, as to whether she went from Oklahoma City to California with her father, where she went after she left California, as to whether or not in the meantime her mother had re-married, as to whether her father had re-married, how long she stayed with her father and her mother at various times. Furthermore, the state asked where she was when she was 15 years of age, as to travels between Indianapolis and Houston, Texas, and Oklahoma City and California, when staying with her father and mother. This evidence was highly prejudicial to the defendant in that it was designed solely and only for the purpose of degrading the defendant in the eyes of the jury. Its sole object was to present the defendant in the light of one who had absolutely no family life or background, and as one who would be more susceptible to becoming involved in a life of crime than one who had good family advantages.

While this court has held that cross-examination of a witness is not to be confined to the particular questions asked nor the precise subject called to his attention on direct examination, such as examination must not extend to matters foreign to the subject matter of the examination in chief, and must be designed to limit, explain or modify the evidence given in chief. Gibbons v. State, 34 Okla. Cr. 407, 246 P. 1107. Moreover, this court has held that the cross-examination of defendant should be confined to the issues of and the transactions which are pertinent to the charge as laid in the information, and it is the duty of the trial court to so confine the cross-examination. Skelley v. State, 64 Okla. Cr. 112, 77 P. 2d 1162. The correct rule as applicable to the situation confronting the court in the case at bar is laid down in Slater v. United States, 1 Okla. Cr. 275, at page 283, 98 P. 110, 113, wherein the court said:

"But it is attempted to justify the admission of this class of evidence upon the ground that it is always permissible to inquire into the antecedents of a witness, by showing his occupation, social connections, manner of living, and such matters. While we approve the principles referred to, we deny its application to the class of evidence now under consideration. The presumption of law is that every person, to a large extent, has the right and power of selecting his occupation, social connections, and manner of living. Being matters largely of his own choice, they indicate his true character, and he is therefore responsible for them, and they may be inquired into for the purpose of affecting his credibility; but these reasons do not apply to indictments, arrests, or imprisonment before conviction, for the obvious reason that they are not matters of choice, but are involuntary, so far as the witness is concerned. When the reason for a rule of law ceases, the rule should fall with it."

The matters inquired about as hereinbefore set forth in the case at bar are matters which were certainly not within the choice of the defendant but were absolutely involuntary so far as she was concerned. She could not control the conduct and actions of her parents relative to the question of whether they were separated or divorced, or where they would live. In all probability the question with whom she would live was a matter that had been determined by the court. The fact that the child had to live intermittently with her father or mother, or with some one else, in a place wherever they happened to reside, and that she was kicked from pillar to post, was entirely involuntary on her part. The fact that she may have been deprived in the early part of her existence of a normal life is a misfortune over which as a child this defendant had no control. For these reasons the foregoing evidence sought to be elicited on cross-examination of the defendant exceeded the proper bounds of propriety and sound discretion. The matters inquired about were of no probative value whatsoever and were designed to degrade the defendant in the eyes of the jury, and for these reasons were highly prejudicial and it was error to permit the same.

Defendant's next objection goes to the proposition that the court committed error in permitting witness Gladden to reinforce his testimony and to bolster it up immediately before his cross-examination. This contention is predicated upon the following proceedings:

"Q. Now, Mr. Gladden, you testified in the examining trial, State versus Ann Doser on the 25th day of January, 1946, do you recall having testified about that time in the preliminary examining trial? A. Somewhere about that date. Q. Did you later testify in the case of state versus— By Mr. Ralls: We object to that as not proper direct examination. This would be for cross-

examination. By Mr. Brown: It is immaterial whether he testified or not. By the Court: Overruled. By Mr. Brown: Exception. Q. You testified in the case of State of Oklahoma versus Ernest England? A. I was down here. I don't remember whether that was the case or not. Q. You testified in May, 1946, in the case of State versus Ann Doser? By Mr. Brown: Objected to incompetent, irrelevant and highly improper. By the Court: Overruled. By Mr. Brown: Exception. Q. I now hand you a transcript of the testimony taken at the preliminary hearing in the case of State versus Ann Doser on the 25th day of January, 1946, and direct you to pages 13, 14, 15 and 16 of that transcript. Have you had occasion to read your testimony from that transcript since you have been here this morning? A. Yes, sir. Mr. Brown: Object to this line of questioning for the reason it is immaterial to the issues in the case and highly prejudicial. I never heard of a proceeding like this before in my life. By the Court: Overruled. By Mr. Brown: Exception. Q. This morning you have testified here before this jury as to certain matters that are not incorporated into that transcript, is that true? By. Mr. Brown: Objected to incompetent, irrelevant and immaterial and not proper to ask that question. By the Court: Overruled. By Mr. Brown: Exception. A. Yes, sir. Q. Can you state to the court and jury why you didn't testify on these matters at the preliminary, particularly as to what Ann Doser told you? A. I don't believe they asked me. By Mr. Brown: We object to this line of testimony and to save time and record we want the same objection and the same exception saved as to each question and answer. By the Court: All right. Q. Your answer is that they didn't ask you? A. Yes, sir."

We are of the opinion that the foregoing proceedings as hereinbefore delineated were not improper procedure. The defendant relies upon McKnight v. State, 50 Tex. Cr. R. 252, 95 S.W. 1056, 1057, wherein that court condemning said procedure said:

"It is not competent to introduce testimony as to what a witness may have sworn to or stated on some previous occasion, simply to confirm or bolster up the testimony of said witness as delivered before the jury, in the absence of some attack on the testimony of said witness, as by showing that the witness had sworn differently or stated differently to the testimony delivered on the trial of the case, or in the absence of some effort made to impeach the witness. We do not understand that any such effort was made here on the part of the appellant. It is true appellant testified in contradiction of the testimony of said witness, but this did not authorize the state to bolster up its own witness by showing former statements of the witness. White's Ann. Code Cr. Proc., § 1119, subd. 4; Riojas v. State, 36 Tex. Cr. R. 182, 36 S.W. 268; Sanders v. State, 31 Tex. Cr. R. 525, 21 S.W. 258. We believe that this illegal testimony was of an injurious character. Appellant in his testimony denied having the pistol. The state's testimony tended to show that he did have it. Improper evidence tending to bolster the state's witness under such circumstances was calculated to injuriously affect appellant."

The case of McKnight v. State, supra, is not the situation in the case at bar. Here the witness had never been interrogated concerning the matters in question. Under these conditions the question was explanatory of the fact that he had not given testimony in the preliminary concerning the matters testified about at the trial. We are of the opinion this was not an attempt to bolster his testimony but was a proper matter of explanation as to why he had not theretofore so testified. It would have been improper for the witness to have volunteered testimony even in the preliminary. The state had the right to explain that the hitherto undisclosed evidence had never been asked for at the preliminary. To hold otherwise might thwart oftentimes the ends of justice in the court's quest for the truth.

Next the defendant says the court erred in permitting witness McBride to repeat and rehash, under guise of rebuttal evidence, the evidence which he gave when the state was putting on its case in chief. The testimony objected to on this ground was in relation to where and the conditions, under which the sheriff talked to defendant while she was in the hospital at McAlester. This proposition is well taken since the so-called rebuttal testimony reveals nothing that had not already been substantially covered in the sheriff's testimony in chief. A casual examination of the record reveals the correctness of this conclusion. In Corliss v. State, 12 Okla. Cr. 526, 159 P. 1015, this court condemned this procedure and therein said:

"* * * The court should not permit a rehash of such testimony under the guise of rebuttal. Counsel for the state have no more right to reserve the principal testimony and introduce it under the guise of rebuttal nor to rehash testimony introduced in chief under the guise of rebuttal, than the accused would have to reintroduce his testimony after the state has closed the rebuttal."

The defendant next contends that the court committed error in giving instruction No. 12, which is in words and figures as follows, to wit:

"You are instructed that the State, in addition to other evidence in the case, relies upon the testimony of Oma Dixon Claunch, Jr., Ernest England and William Eugene Slussler, who were accomplices in this case, and in this connection you are instructed that you cannot convict the defendant, Ann Doser, upon the testimony of the accomplices, unless such testimony is supported or corroborated by other testimony, and in this connection you are advised that Oma Dixon Claunch, Jr., Ernest England and William Eugene Slussler being accomplices, their testimony must be corroborated by other competent testimony, which may be sufficient, either through cir-

cumstances or direct testimony and such corroboration would be sufficient even though such corroboration is slight, if it was upon a material fact or facts, which tend to connect the defendant, Ann Doser, with the commission of the crime charged."

An accomplice is one culpably implicated in the commission of a crime of which the defendant is accused, or one who knowingly and voluntarily co-operates, aids or assists in the commission of the crime. Burns v. State, 72 Okla. Cr. 409, 117 P. 2d 144. The state's evidence clearly supports the foregoing rule. The defendant contends that this instruction invades the province of the jury, and assumed that the three named accomplices had told the truth and that the jury should convict the defendant if they believed the testimony of the accomplices had been corroborated. In support of this proposition she cites Crenshaw v. State, 48 Tex. Cr. R. 77, 85 S.W. 1147; Wadkins v. State, 58 Tex. Cr. R. 110, 124 S.W. 959; Campbell v. State, 57 Tex. Cr. R. 301, 123 S.W. 583; Brown v. State, 57 Tex. Cr. R. 570, 124 S.W. 101, all from the Court of Criminal Appeals of the State of Texas. This court does not follow the rule as announced in the State of Texas to the effect that to so instruct the jury amounts to an invasion of the province of the jury. In fact, it has been held that the instruction given in the case at bar is more favorable to the accused than one which leaves the question of whether or not the witness was an accomplice up to the jury. As was said in Comba v. State, 68 Okla. Cr. 373, at page 380, 99 P. 2d 170, 173:

"The instruction given does not aid the state, but is for the protection of the accused, and is probably more favorable to the defendant than he is entitled to under the evidence. By instructing the jury as a matter of

law that the Mashburns were accomplices of the defendant, a greater burden was thereby placed on the state."

And in the body of the opinion 68 Okla. Cr. at page 381, 99 P. 2d at page 174:

"The instruction given is more favorable to an accused than one which leaves to the jury the question of whether or not the witness is an accomplice. Submitting the question of accomplicity to the jury may in some cases confuse them. It is conceivable that they might erroneously conclude than an accomplice in fact is not an accomplice, and return a verdict of guilty without sufficient corroboration, which they might not have done if they had understood clearly that the witness was as a matter of law an accomplice and that corroboration was necessary."

This contention is wholly without merit.

The defendant also complains that it was error to instruct the jury that corroboration need only be slight. In Tillman v. State, supra, on this point this court said [82 Okla. Cr. 276, 169 P. 2d 223]:

"Evidence corroborating the testimony of an accomplice need not cover every material point testified to by the accomplice, nor need it be sufficient alone to warrant a verdict of guilty, but if the accomplice is corroborated with respect to one material fact by independent evidence tending to connect defendant with the commission of the crime, the jury may infer that the accomplice speaks the truth, though such corroborating evidence must show more than the mere commission of the offense or circumstances thereof."

See, also, Mitchell v. State, 50 Okla. Cr. 393, 60 P. 2d 627.

The language employed in Tillman v. State, supra, relative to corroboration as to one material fact of independent evidence meets with our approval. However,

we see little difference in that and the language employed in the instruction, supra, to the effect that such corroboration be sufficient even though slight. While the foregoing instruction may not have been technically correct, as was said in Comba v. State, supra, where an instruction that is given is technically incorrect, yet if the same is favorable to the defendant he cannot complain. In order to constitute grounds for reversal the instruction given must have deprived defendant of some substantial right. We do not believe the foregoing instruction deprived the defendant of any substantial right, but to the contrary was more favorable to him than the instruction contended for by the defendant.

On the question of corroboration the defendant contends that the case should fall because of a lack of corroboration. As hereinbefore noted the accomplices' testimony need only to be corroborated on one material fact. In this connection the testimony of Sheriff McBride is sufficient. The sheriff's testimony in chief was substantially as follows: That after he obtained permission from the nurse he interviewed the defendant in St. Mary's Hospital in McAlester, Oklahoma. She said "they were coming from Texas and had a car and had to leave it at Denison torn up and that they all gathered up between Red River and Dension and all agreed to get another car;" that "We agreed to take the first car that came along." He asked her "how she expected to get away with a car" and she said "they thought they would take the car and strip him * * * where the party couldn't notify the police until they got away if they stripped him of his clothes."

In substance, in further testifying in relation to their possession of the guns he said that she told him they

got the first gun in a burglary in Austin, Texas, and the second one in a burglary at Denison, Texas.

In this connection, on cross-examination, the defendant brought out that in the preliminary hearing the sheriff testified for the state on direct examination that she said:

"* * * they had stolen a car in Texas, which was broken down. They left it at the Texas Border and agreed to get hold of a car," "said they made an agreement down there to get another car * * *." That that "was about all she would tell me, that I would ask her and she would come to the same story again."

Further, on cross-examination herein, he was asked this question: "You told us today that they were going to get a car and strip the driver off naked and make their get-away from him? A. Yes, sir. Didn't I make that statement before?" The record discloses that he did not make the statement at the preliminary hearing.

In this connection it is well to point out here that after the sheriff had given his testimony in the preliminary hearing, the extent of his cross-examination was to the following effect:

"By Mr. Rawls: Mr. McBride, did Ann say where she was going? A. Judge, I believe she said she was going to Oklahoma City to her mother's. Mr. Rall's: That is all."

On these matters concerning which the defendant seeks to discredit the sheriff's testimony relative to his testimony being different in the trial to that given by him at the preliminary examination, we cannot help but observe that the cross-examination was entirely inadequate to bring out what might have been elicited from the sheriff. Particularly is this true relative to the state-

ments made by the defendant while in the hospital to the effect that they were going to strip the first man whose automobile 'they took so he could not report the crime. Nor can we help but observe that it is customary in preliminary examinations, in criminal matters, for the state to refrain from disclosing its entire hand and to be content with merely making a prima facie case. It is probable had the proper questions been put to the sheriff and had he been pressed, at the time of the preliminary examination, he would have disclosed the fact that they intended to strip the driver after robbing him of his automobile. We hardly see how the state can complain concerning a matter which has not been testified to at the preliminary examination when no effort was made at that time on cross-examination to elicit the information not testified about in the preliminary but fully disclosed in the trial. It suffices to say that while the sheriff's testimony in relation to stripping the driver of the automobile may appear to be an afterthought, the seeming inconsistency therein goes only to its credibility. If believed by the jury his testimony constitutes sufficient corroboration upon material facts to warrant it in its finding that the testimony of the accomplices was corroborated. The corroboration in the case at bar meets the requirement of going further than merely showing the commission of the offense, and this is essential. It shows preparation. As was said in Livingston v. State, 29 Okla. Cr. 247, 233 P. 235:

"* * * The corroboration of an accomplice must show more than the mere commission of the offense. It must show some fact or circumstance implicating the accused in the perpetration of the crime."

And in Cornett v. State, 42 Okla. Cr. 93, 274 P. 676, this court said:

"* * * Some fact or circumstances implicating the accused in the perpetration of the crime must be shown independently of the testimony of the accomplices."

To the same effect is Mitchell v. State, 59 Okla. Cr. 393, 60 P. 2d 627; Holmes v. State, 52 Okla. Cr. 406, 5 P. 2d 770; Hamilton v. State, 53 Okla. Cr. 281, 10 P. 2d 734; Capshaw v. State, supra; Fitzgerald v. State, supra. There are other circumstances in the case at bar which are corroborative, but in view of the foregoing principles we do not believe it necessary to discuss them.

In addition to defendant's contention that the court erred in giving instruction No. 12, hereinbefore considered, she contends that it erred in giving instructions Nos. 6, 7, 8, 9, and 10. We have examined said instructions and are of the opinion that the contentions set forth are without merit save and except as to the possibility of instructions Nos. 8, 9 and 10, from which it may be drawn that the plaintiff acting alone may have killed the deceased. The evidence is entirely void of such a state of facts, and in the event this case is tried at some time in the future, such intimations should be avoided. We are also of the opinion that instructions Nos. 8, 9, and 10 are repetitious as bearing upon the facts involved in connection with the robbery of the deceased Edward Streckenfinger. Such repetition should be avoided in all of the court's instructions, as was said in Morris v. Territory, 1 Okla. Cr. 617, 99 P. 760, 766, 101 P. 111:

"* * * Unnecessary repetitions of correct propositions of law are liable to give them undue prominence in the minds of the jury, and thus improperly affect their verdict. This practice was condemned in the case of Price v. Territory, 1 Okla. Cr. 358, 98 P. 447. That case presents our views upon this question so fully that a further discussion of this matter is not necessary here."

Other than this we find that the court's Instructions Nos. 6, 7 are a reasonably fair statement of the law.

Finally, the defendant contends that the court erred in giving instruction No. 16-A. That instruction reads as follows:

"Gentlemen of the jury, in view of argument that has come up, you are instructed that the law presumes every person is of good reputation for being a peaceable and law abiding citizen, but in a criminal prosecution, the State cannot offer evidence that defendant does not bear a good reputation for being a peaceable and law abiding citizen, until the defendant puts her reputation in issue, by offering evidence by witnesses that she is a person bearing a good reputation for being a peaceable and law abiding citizen. After defendant offers such evidence, then the State has the privilege of offering evidence to show that defendant is not a person bearing a good reputation as a peaceable and law abiding citizen.

"Where a person takes the witness stand, whether the defendant, or any other witness, evidence that witness, or defendant as witness, has been convicted of crime involving moral turpitude, is admissible to show credibility of the witness."

It is not clear from the record as to the necessity for giving this instruction. If the court had confined the issues, as has hereinbefore been indicated, there would have been no necessity for giving such an instruction. As counsel for the defendant contends, the effect of this instruction was to tell the jury that, if the defendant had undertaken to prove her good character, then the prosecution could come forth and show her bad character and that the only thing that has prevented the prosecution from really showing her bad character is the fact that the defendant did not give the prosecution a chance by first offering evidence of her good character. The de-

fendant not having put her character in issue in fact, the same is not and should not have been in issue, save and except, as the admissible facts as hereinbefore indicated would tend to make her character an issue.

Defendant raises other issues herein which we find to be without merit.

This case has been a great hardship on counsel for both the state and the defendant. Both have gone through two trials, and this appeal. The case was well briefed by both the Attorney General and counsel for the defendant, which has been most helpful in arriving at a conclusion. To them we extend our sincere commendation. We are of the opinion that for all of the foregoing reasons this cause should be and the same is accordingly reversed and remanded for a new trial.

JONES, P. J., and BAREFOOT, J., concur.