**George Eldon VAUGHN, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**A–15979.**

Court of Criminal Appeals of Oklahoma.

Sept. 1, 1971.

Rehearing Denied Oct. 21, 1971.

William M. Thomas, Jr., Pryor, for plaintiff in error.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Asst. Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge:

George Eldon Vaughn, hereinafter referred to as Defendant, was charged, tried, and convicted in the District Court of Mayes County, Oklahoma, for the offense of Shooting with Intent to Kill. His punishment was fixed at twenty (20) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Alice Dixon testified that on December 19, 1969, she was employed at the Grand Valley Hospital in Pryor, Oklahoma. She testified that at 11:00 o'clock p. m., her husband picked her up from work, and that they traveled from the hospital directly to their home. She testified that upon the arrival at their house, as she started to get out of the car, she observed a car behind theirs, and that a man started getting out of the car. As she started to get out of her car, the man approached the car on her side, and without saying anything, walked up to her and shot her three times. She was unable to identify the person firing the shots. She testified that on the evening in question, she was wearing a black and white checked coat.

Ronnie Dixon testified that on the evening of December 19, 1969, he went to the hospital to pick up his wife, Alice Dixon. He testified that upon picking his wife up from the hospital, they proceeded to drive to their home, which was in a trailer park, and that he noticed a car following him prior to the time they arrived at the trailer park. He further testified that the car followed them up to where they stopped at their trailer home, and that as his wife started to alight from their car, the person in the automobile behind them got out,

walked up to the passenger side of the Dixon automobile, and fired three shots at his wife. He identified that person as being the defendant. He got out of the car and ran toward the back of the automobile, wherein the defendant fired more shots at him, two of which struck him. Mr. Dixon grabbed the arms of the defendant and wrestled him to the ground, taking the gun away from him. Shortly after this time, his brother-in-law, Richard Mannes, arrived, and he handed Mannes the gun. Mannes sat on the defendant while Dixon went to check on his wife.

Richard Mannes testified that on the evening of December 19, 1969, shortly after going to bed, he heard what appeared to be shots, and upon looking out the window, he observed Ronnie Dixon down behind a car. Mannes jumped up and put on his clothes, and ran to where he had observed Dixon. He then ran back to the door and told his wife to call the police and an ambulance. He then went back to the scene, took the gun from Dixon, and held down the defendant. He testified that he held the defendant until another neighbor arrived, at which time the neighbor, Mr. Pearson, held the defendant until the police arrived. He gave the weapon to a police officer.

Nate Pearson testified that on the evening of December 19, 1969, he was watching television when he heard shooting, and someone scream. Pearson went to the scene and observed Richard Mannes holding a person, whom he identified as the defendant, down on the ground. Mr. Mannes got up off the defendant, and Pearson held him down until the police arrived.

Officer Fleming testified that he went to the trailer court the evening of December 19, and upon arriving, he found Mr. and Mrs. Dixon wounded, and Mr. Pearson lying on top of the defendant. He further testified that Richard Mannes handed him a pistol, which he turned over to the Sheriff of Mayes County.

Sheriff Weaver testified that he investigated the scene at the trailer court, and that he received a pistol from Officer Fleming. He identified the pistol, which was introduced into evidence. He further testified that he helped prepare and tag the weapon and spent cartridges, which were transmitted to the State Crime Bureau for ballistics examination.

Mr. Ray Lambert, a firearms expert for the Oklahoma State Bureau of Investigation, testified that he received the pistol, the cartridges, and one bullet by mail, and upon examining the same, was of the opinion that the cartridges were fired in the pistol.

Dixie Marlene Vaughn testified that she was employed at Grand Valley Hospital as a nurse's aide. She testified that she left work on the nineteenth day of December, shortly after Alice Dixon. She further testified that on that date, she was wearing a white uniform, and a coat, which she was wearing at the time of the trial. She was formerly married to the defendant, and was divorced from him on October 7, 1969. After the divorce, the defendant forced his way back into the house and lived there for one week. She further testified that the defendant had threatened to kill her if she went out with anyone else.

The defense recalled Sheriff Weaver, who testified that he observed the defendant on the night in question, and did not see anything unusual about his condition.

The defendant testified that he was forty-five years of age, and prior to December 19, 1969, he had been living in Stockton, California. He further testified that he left California on the eighteenth day of December, 1969, with three other people, and drove from there to Ft. Smith, Arkansas. He testified that they drove straight through, and that he drove all but two hours of the time. He took sixteen bennies to stay awake during this period of time. He testified that upon arriving in Oklahoma, they stopped and got some beer, and upon leaving Locust Grove, he did not remember anything until a highway patrolman shined a light in his face in Pryor,

Oklahoma. He had no recollection of firing or discharging a pistol.

■ Defendant's first and fourth propositions are not supported by the citation of authorities. We have repeatedly held that it is necessary for counsel of plaintiff in error not only to assert error, but also to support his contentions by both argument and by citations of authority. Where this is not done, and it is apparent that the defendant has not been deprived of any fundamental rights, this Court will not search the books for authorities to support the mere assertion that the trial court erred. Sandefur v. State, Okl.Cr., 461 P.2d 954. We have carefully examined the propositions asserted, and are of the opinion that they are without merit.

■ The next proposition asserts that the trial court erred in admitting State's Exhibit One, a black and white checked coat, which was worn by the victim, into evidence. A later witness, the former wife of the defendant, wore a black and greyish checked coat into the court room when she testified. The defendant contends that the introduction of the coats into evidence was nothing but a bold attempt by the State to inflame the minds of the jury, and to establish a motive, or to show the frame of mind of the defendant at the time of the alleged shooting by insinuation that a mistake had been made by the defendants as to the identity of the person shot. It has long been the law of this State that it is proper to introduce evidence tending to show motive or intent. In 59 Okl.Cr. 412, 60 P.2d 395, we stated in the Syllabus in the case of Upchurch v. State:

> "The existence of a motive for the commission of a crime is not indispensable to a conviction, but proof of motive is always competent against the defendant. Motive is but a circumstance, and the existence or nonexistence of motive is immaterial where the guilt of the defendant is clearly established."

In the instant case, the evidence of defendant's guilt is crystal clear. We are of the opinion that the introduction of the Exhibits into evidence was merely surplusage; however, we are of the opinion that the trial court did not err in admitting the Exhibits into evidence as tending to establish motive.

■ The next proposition asserts that the trial court erred in admitting the testimony of Dixie Marlene Vaughn. Defendant argues that the defendant and the witness Vaughn were common law husband and wife, and as such, her testimony was privileged. We are of the opinion that the Record does not reflect that such common law relationship existed. The witness Vaughn testified that she was divorced from the defendant on October 7, 1969, and that after the divorce, the defendant physically forced his way into the house and threatened to kill her if she did not come back to him.

The defendant testified that he had been living in California until two days prior to the time that he returned to the state of Oklahoma. There is no evidence in the Record to reflect that after the defendant left the witness Vaughn's residence that he ever assumed any of the marital duties or obligations. In McKee v. State, Okl.Cr., 452 P.2d 169, we stated in the Syllabus:

> "To constitute a valid common-law marriage there must be an *actual and mutual agreement* to enter into a matrimonial relation, *permanent and exclusive* of all others, between the parties capable in law of making such a contract, consummated by their cohabitation as man and wife, or their *mutual assumption openly of marital duties and obligations.*" (Emphasis Added.)

We are of the opinion that the trial court properly permitted the witness Vaughn to testify, and that the Record does not support defendant's contention that defendant and Dixie Vaughn were, in fact, common law husband and wife.

■ The final proposition contends that the State gained information by questioning the defendant without first advising him of his constitutional rights. The trial Record does not reflect that the State at-

tempted to introduce any statements made by the police officers or by the defendant. A Preliminary Hearing Transcript, however, does reflect that the arresting officer, Jim Fleming, asked the defendant four questions on the way to the police station, without advising him of his constitutional rights. The Preliminary Hearing Transcript reflects the following transpired as Officer Fleming was transporting the defendant to the police station:

"Q. What did you ask him?

"A. I asked him what happened.

"Q. What did he tell you?

"A. He told me he didn't know.

"Q. All right, sir. What was the next question you asked him?

"A. I asked him who the people was.

"Q. What did he say?

"A. He said the woman was his wife. And, I asked him who the man was, and he said he didn't know.

"Q. All right. Did you ask him another question?

"A. I asked him if he shot them.

"Q. What did he say?

"A. He didn't answer."

It is readily apparent that the only information gained by this questioning was that the defendant thought that one of the persons involved was his wife. There is nothing in the Record to reflect that Officer Fleming informed any other police official of the conversation with the defendant. The knowledge that the defendant had threatened to kill his former wife was not a deep dark secret in that the defense counsel established on cross-examination that the witness Vaughn had told everyone in the community that he was trying to kill her.

We thus conclude that the knowledge gained by the police officer in the illegal interrogation of the defendant was not of such a consequence as to prejudice the rights of the defendant. We, therefore, find this proposition to be without merit.

In conclusion, we observe that the Record is free of any error which would justify modification or require reversal. Judgment and sentence are, accordingly, affirmed.

BRETT and NIX, JJ., concur.