Donald D. HOGAN, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–74–413.

Court of Criminal Appeals of Oklahoma.

Jan. 9, 1975.

Rehearing Denied Jan. 27, 1975.

Roehm A. West, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Patrick H. Kernan, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

This is an appeal from the District Court, Ottawa County, Case No. CRF–72–688, where Donald Dee Hogan, hereinafter referred to as defendant, was charged, tried and convicted for the crime of Perjury, in violation of 21 O.S.1971, § 491. He was sentenced to serve a term of three (3) years imprisonment and a timely appeal has been perfected to this Court.

The State's first witness at trial was G. C. Freeman. Both parties stipulated that Mr. Freeman was a competent and qualified court reporter and that he took the notes and memos in the Ottawa County Grand Jury proceedings of November 28, 1972. Mr. Freeman identified certain transcript pages of the testimony before the Grand Jury on that date and he confirmed these pages were unaltered and were exactly as he had typed them. The trial court then read certain excerpts from these pages which contained testimony of the defendant before the Grand Jury on November 28, 1972, and Mr. Freeman identified the defendant as the same person who had given this testimony on that date.

Joe Chandler testified that he was the Foreman of the Ottawa County Grand Jury on November 28, 1972. He stated that on that date he swore in the defendant

as a witness in the investigation of the alleged robbery of Billie Mendenhall and that he was present when the defendant was advised of his rights and warned against perjury. The defendant stipulated that Mr. Chandler could verify the fact that he was present when the defendant gave his testimony, which had been read from earlier by the trial court, before the Grand Jury.

Carl Craig testified that on or about August 21, 1972, he committed an armed robbery upon Billie Mendenhall. He stated that prior to the robbery he was employed as the defendant's bodyguard. He further stated that the defendant had helped him plan the robbery because the defendant had a grudge against Billie Mendenhall. He testified that after the robbery the defendant drove him to Oronogo, Missouri, whereafter he later went to Arkansas where he caught a plane for Los Angeles, California. He remained there until he was extradited to Oklahoma on December 27, 1972. He further testified that on September 1, 1972, he placed a long distance person-to-person collect call from Hollywood, California, to the defendant at the defendant's club in Miami, Oklahoma. He said he used the name of Billy Rambo in making the call and that both he and the defendant were familiar with the fact that he had called himself by that name in the past. He stated there was no doubt in his mind that the person with whom he talked that day was the defendant because having worked for the defendant, he was familiar with the defendant's voice. He related the conversation he had with the defendant and that a few days after this phone call he was arrested by the California authorities.

The State's next witness was Gary Golden. The defendant stipulated that Mr. Golden was employed at Southwestern Bell Telephone Company and that there were certain records under his complete custody and control. The witness identified the Xerox copy of the company toll ticket which indicated that on September 1, from a prefix number 446, a person-to-person collect call was made from a Billy Rambo to a party with the last name of Hogan, at the number 918–542–4168. He then identified a long distance phone statement which showed that on September 1, a call was made from a Los Angeles, California, prefix number 466 to 542–9150 in Miami, Oklahoma, and that this call was billed to 542–4168 in Miami, Oklahoma. He further testified that the call was made to the defendant's night club and that the number to which the call was billed was listed in the defendant's name.

The defendant then requested a "Denno proceeding"[1] which thereafter was had outside the presence of the jury on the admissibility of certain statements the defendant made during an interrogation session with the District Attorney's office. The trial court ruled that the rights of the defendant had not been violated and thus ordered the trial to proceed.

Robert S. Gee testified that he was the Acting District Attorney of Ottawa County from August 1972 until late March of 1973. He said that he was present in the Grand Jury proceedings on November 28, 1972, when the defendant testified and that he was the individual who examined the defendant at that time. He testified that the defendant was under oath and was advised of his rights. He further stated that while the defendant was under oath before the Grand Jury the defendant testified that he had not talked by telephone with Carl Craig. He further stated that he was present when the defendant was arrested and brought into the District Attorney's office on December 28, 1972, at approximately 8:00 P.M. He stated that before the defendant was interrogated he advised the defendant of his constitutional rights and that the defendant understood those rights. He testified to the conversation during the interrogation and that during this conversation the defendant admitted lying to the Grand Jury about not talking to Carl Craig and that the defendant stated

1. See, Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

he lied to the Grand Jury in order to protect Carl Craig.

Floyd Ingram testified that he was employed as a Deputy Sheriff of Ottawa County on December 27, 1972. He stated that he participated in the arrest of the defendant and that subsequent to the arrest, he was present in the District Attorney's office during the interrogation of the defendant. He testified to essentially the same facts relating to the interrogation as did the previous witness, Bob Gee.

The defense called Goldie Goodrich to testify. She stated that in August of 1972, she worked at the defendant's club. She further testified that on August 21, 1972, the day Billie Mendenhall was robbed, upon opening the defendant's club for business that day she discovered the back room looked as though someone had broken in through the ceiling. She said she called the defendant and he came over and worked on the ceiling. She further testified that while he was there he said something about going to Joplin, Missouri.

Travis McSpadden next testified he was employed as an inspector with the Oklahoma Tax Commission and had been for approximately the past nine years. He stated that on August 21, 1972, he visited with the defendant at a Fina Station on Highway 10. He stated that he had a short friendly conversation with the defendant and that he did not recall the defendant's car nor anyone being with the defendant.

Denver Miller testified he was employed at the defendant's club as a bartender and was so employed in August and September of 1972. He stated that his hours at the club during August and September of 1972 were from 7:00 P.M. until 2:00 A.M. He testified that on or about September 1, 1972, the defendant's club had two telephones, a pay phone and a private line in the office. He stated that in early September, 1972, while on duty at the defendant's club, he received a long distance call from California. He stated the operator said the call was for the defendant and he told the operator the defendant was not there; the operator asked if he would accept the call, to which he agreed, but he told the operator to charge the call to the office phone. He stated he charged the call to the office phone because otherwise he would have to take money out of the register and this would cause him to come up short. He further testified that at the time of the call the defendant was at the Elks Lodge. He said that subsequent to receiving the call, he called the Lodge and told a Carl Lacy to relay to the defendant that he had accepted the said call. He testified the defendant returned to the club approximately an hour later.

Carl Lacy testified he was the manager of the Miami Elks Lodge and had been for the past 13 years. He said that the Lodge had bingo games on the first Friday of every month and that on September 1, 1972, the defendant and defendant's wife attended the bingo game. He further testified that sometime that night he received a call from Denny (Denver Miller) who asked him to relay a message to the defendant that he (Denny) had accepted a call for the defendant at defendant's club.

The defendant testified in his own behalf. He stated that he was the owner of the Twilight Club in Miami, Oklahoma. He testified that some two weeks prior to August 21, 1972, he employed Carl Craig as his bodyguard because of threats of harm to his club and because he had been burned out twice before. He related the following facts which occurred on August 21, 1972. Carl Craig asked him if he could borrow a Volkswagon, to which the defendant agreed. At this time the defendant told Craig he was going to Joplin that day. Later, Goldie called him about the ceiling in the club and he went over to work on it. Later that day while on the way to Joplin to pick up some supplies with his wife he saw the tax man at the Fina station on Highway 10. In Joplin he called the Sheriff's office in Miami after having talked on the phone to Goldie, who was at the defendant's club, and she told the defendant that the authorities had been

to the club looking for Carl Craig. He further testified regarding his being at Bob Gee's office in December after being arrested for armed robbery. He said that while in that office with Butch Garrette, Floyd Ingram, Bob Gee and Newman, there was a knock at the door. He said that he saw a Fred Phillips at the door and, thereafter, after having a certain conversation with Butch Garrette, he denied wanting Phillips as his lawyer. He further stated he never admitted taking any phone call from Carl Craig subsequent to August 21, 1972. He also stated that on the evening of August 21, 1972, while he and his wife were at the Elks Lodge, his club's bartender had accepted a call for him from California. He further said that the message of this call was relayed to him at the Elks Lodge by Carl Lacy. He testified that he knew a Billy Rambo to be actually Lee McConnell and also that Carl Craig had sometimes used the name of Billy Rambo. He lastly testified that he denied ever giving false testimony to any Grand Jury.

Bonnie Hogan testified she was married to the defendant and had been for the past seven years. She stated that the defendant never received any phone call from Carl Craig subsequent to August 21, 1972. She testified to essentially the same facts on August 21, 1972, as did the defendant regarding having gone to the Elks Lodge; there defendant receiving a message from Carl Lacy of a phone call which the defendant's bartender had accepted for him that day; the defendant receiving a call from Goldie regarding the ceiling problem at the club and the defendant's having gone to work on it. She testified that she and the defendant had that day gone to Joplin to pick up some supplies and that while there the defendant made a phone call to the Sheriff's office in Miami. She further testified that around December 27, she and the defendant were arrested and taken to the Courthouse in Miami. She said that while she was there the defendant was taken upstairs and that thereafter she called a lawyer, ultimately reaching Fred

Phillips. She stated that Phillips came to the Courthouse and that Phillips told her he was not allowed to see her husband, the defendant.

George Couch testified as a character witness for the defendant and said that the business he had conducted with the defendant over the past seven years concerned the lending the defendant money and that the defendant's payment record was excellent.

 The defendant's first proposition of error asserts that certain in-custody incriminating statements of the defendant were improperly admitted into evidence by the prosecution because the defendant, at the in-custody interrogation, was denied counsel. We firmly agree that each individual has the right to remain silent and to have counsel present at the interrogation and that these rights are indispensable to the protection of the Fifth Amendment privilege as applied to the States through the Fourteenth Amendment. U.S.C.A.Constitution Amendment 5; Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We further recognize that these rights may be waived if the individual in custody has been fully advised of his rights, and then knowingly, intelligently and voluntarily waives these rights. See Brown v. State, Okl.Cr., 384 P.2d 54 (1963).

In the case at bar defendant argues that because of coercion by his interrogators he was denied his right to counsel. We have examined the entire record and the excerpts which defendant cites in support of his argument and for the following reasons we find this first propostion to be without merit. The admissibility of the incriminating statements made by the defendant on the night of the interrogation must be determined in view of all the evidence of the "Denno proceeding" which was had on these alleged incriminating statements. The defendant contends that a coercive statement was made by the Assistant District Attorney Garrette to the defendant just subsequent to the time when an attor-

ney, Fred Phillips, knocked at the door of the interrogation room. The facts relating to this time as testified to by Assistant District Attorney Garrette is revealed in the record of the "Denno proceeding" wherein it states:

"A. 'I'll see if Mr. Hogan wants you as his attorney.'

Q. All right, did you go back inside?

A. I did.

Q. And did you have a conversation with Mr. Hogan?

A. I did.

Q. Did you advise him that Mr. Phillips was outside?

A. I did.

Q. Did you have any other conversation with him?

A. I don't believe I did at that time.

Q. Well, minutes later did you have any conversation with him?

A. Oh, I did, yes, during the course of the evening.

\* \* \* \* \* \*

Q. And do you recall making a statement to Mr. Hogan: 'That if Fred Phillips represented him, that Mr. Hogan would go [to] the penitentiary and Fred Phillips would be walking the streets free?'

A. Not in those words, but there was a conversation to that effect." (Tr. 75–77)

The defendant contends that such a statement by the Assistant District Attorney was coercive and thus denied the defendant of his right to counsel. However, the record reveals that on cross-examination assuming such a statement to be coercive, such statement was made after the interrogation of the defendant. Such a determination is properly concluded from the cross-examination of Assistant District Attorney Garrette at the "Denno proceeding", where he testified as follows:

"Q. Mr. Garrette, just a moment. A couple of questions. When you came back into the room after talk-ing to Mr. Phillips, what did Mr. Hogan say to you in regard to whether Fred Phillips represented him or not?

A. He told me that he didn't desire Fred Phillips to represent him.

Q. Now, you say words not to that effect. Would you relate that conversation in regard to—

A. —And when it took place?

Q. Yes.

A. It took place—

MR. WEST: I'm going to object to— I believe the question and answer has already been made and it has been made explicitly clear.

THE COURT: Overruled, exception allowed, sir. You brought this out. I would like to hear myself what it is.

A. It took place after we had questioned Don Hogan and right at the end of the meeting when Don and I—we were standing over at the northeast corner of your office, I don't even believe you were in the room. We had discussed earlier Fred Phillips, the alleged meeting, just conversation, and I told Don that he should consider very carefully who he hired as an attorney, because an attorney, if he should get time, doesn't go with him. Since these are felonies, he should very carefully consider who he gets as an attorney." (Tr. 77–78)

To the contrary, the defendant contends that statement was made at the time when the Assistant District Attorney asked defendant whether or not he wanted Fred Phillips as his attorney.

As sole support of his contention, the defendant offers his testimony to wit:

"Q. Did Mr. Garrette have any conversation with you?

A. Yes, sir.

Q. What did you say?

A. He said, 'You sure got somebody nervous.'

Q. What else did he say?

A. I said, 'Well, who are you talking about?' He said, 'Fred Phillips.' And I said, 'Well, why should he be nervous, I'm the one that is arrested.' And he said, 'Well, he is out here, he wants to represent you. Do you want him as a lawyer?' But he said, 'Before you answer that question,' he said, 'I want to remind you, that you might be in jail and he will still be walking the streets.'

Q. What was you—

A. —And I said, 'In other words, Butch, if I hire him as my lawyer, I'll go to prison?' I said, 'If you are going to put it to me like that,' I said, 'No, sir, I do not want him as my lawyer.' " (Tr. 86–87)

The defendant's testimony is controverted by the testimony at the "Denno proceeding" of Robert S. Gee, who was Acting District Attorney on the night of the interrogation of the defendant. The testimony of Gee corroborates the testimony of the Assistant District Attorney Garrette, and such is illustrated in the "Denno proceeding" where he testified as follows:

"Q. All right, did Mr. Garrette step outside the door and close the door behind him?

A. Yes, sir.

Q. Did you overhear any of the conversation between Mr. Garrett and Mr. Phillips while the door was closed?

A. No, sir, I did not.

Q. And did Mr. Garrette come back inside your office?

A. Yes, sir.

Q. And did he have any conversation with Mr. Don Hogan?

A. Yes, sir.

Q. Did you overhear the conversation?

A. Yes, sir.

Q. Did you overhear all of it?

A. Yes, sir.

Q. Do you recall any statement—

A. —Well, I overheard all of the conversation at that particular time, yes, sir, at the time that he stepped back in.

Q. Well, at anytime that evening, anytime that evening, did Butch make any statement—when I say Butch, I say with respect,—did Mr. Garrette make any statement to Mr. Hogan that if he employed Fred Phillips, Attorney at Law, that Mr. Phillips would be in the— or that Mr. Hogan would be in the penitentiary or jail and that Mr. Phillips would be walking the streets?

A. No, sir, not in my presence.

Q. Did Mr. Garrette go to the door the second time? Did he go to the door once or twice that evening?

A. This is the way I remember it happening Mr. West. There was a noise outside and—my present thinking, although I'm not for sure, is that I didn't know who was out there until Mr. Garrette stepped back in and said that Mr. Phillips was outside; said that he represented Mr. Hogan, and asked Mr. Hogan if he wanted to see him? And upon Mr. Hogan telling him, 'No, that he did not. That Mr. Phillips did not represent him then, never had, and he didn't know what he was doing out there and that he did not care to see him.' Then Mr. Garrette stepped back outside and shut the door." (Tr. 90–92)

\* \* \* \* \* \*

Q. And did you personally advise Mr. Hogan of his rights?

A. I did.

Q. And what were those rights you advised him of?

A. I advised him that he had the right to remain silent; that anything he

said could be used against him. I also advised him that he could have an attorney present; that he had the right to call an attorney; that he could discuss it with an attorney, and if he couldn't afford one that the State would appoint one for him and that those rights continued throughout the entire stage of the questioning. I asked him at that time if he understood it, he said, yes, and I said, knowing that, do you wish to answer my questions? I advised him that he was under arrest on suspicion of perjury and assessory on being involved on the robbery of Billie Mendenhall." (Tr. 94)

Assistant Attorney Garrette was then recalled as a witness on behalf of the defendant wherein he reiterated that any statement regarding the possible representation of the defendant by Mr. Phillips was made subsequent to the interrogation of the defendant. This is revealed in the following excerpts of the "Denno proceeding", as follows:

"Q. Mr. Garrette, did you ever made such a statement to Mr. Hogan?

A. Not in those words, Mr. Gee.

Q. Were the words as previously related at the end of the conversation?

A. Yes, sir.

Q. Did you hear Mr. Hogan's testimony as to the conversation that he says you said whenever you came back into the room?

A. Yes, sir.

Q. Did you say that?

A. No, sir. But I do remember there was mentioned later when I was talking to Don, after the questioning was apparently over, that Mr. Phillips did appear to be very nervous when he was outside.

Q. But at the time of the questioning and at the time that Mr. Phillips was out there, did you ever at any-

time imply or threaten Mr. Hogan with going to the penitentiary if he employed Mr. Phillips?

A. No, sir.

Q. Did you ever at anytime threaten to send him to the penitentiary if he employed Mr. Phillips?·

A. Well, if I did, I didn't mean it that way. He could have taken it that way, I can see why, because we were discussing Fred Phillips quite a bit." (Tr. 99–100)

The defendant contends that Mr. Garrette's statements concerning possible representation of the defendant by Mr. Phillips were made at the time during the interrogation when Mr. Garrette asked defendant whether or not he wanted ·Mr. Phillips to represent him. Mr. Garrette testified at the "Denno proceeding" that his statement concerning possible representation of the defendant was made after the interrogation and, further, Mr. Gee testified that at no time during the questioning of the defendant did he hear Mr. Garrette make any coercive statement. We are of the opinion and find that after being advised of his constitutional rights, the defendant made the incriminating statements prior to any alleged coercive statement by the Assistant District Attorney Garrette and that such a later statement by the Assistant District Attorney Garrette did not affect the admissibility or validity of the defendant's incriminating statements at trial. We have consistently held that where there is· competent evidence in the record from which the jury could reasonably conclude the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts. See Jones v. State, Okl.Cr., 468 P.2d 805 (1970). Following this reasoning we hold that there was sufficient evidence in the "Denno proceeding" whereby the trial judge could

properly conclude the defendant had not been denied his constitutional right of counsel and thus the defendant's incriminating statements were properly submitted to the jury.

■■ The defendant's second and third propositions of error have commonality in subject matter in that both are essentially based on the defendant's allegation that the Court erred in admitting testimony concerning another crime allegedly committed by the defendant. The general rule in this State is that when a defendant is put upon trial for one offense he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone and the admission of evidence of other crimes, either prior or subsequent to the offense for which he is on trial, is inadmissible. However, evidence of separate and similar offenses is admissible when it is material and proper to show (1) motive, (2) intent, (3) absence of mistake or accident, (4) identity of person charged with the commission of the crime for which an accused is put on trial, and (5) common scheme or plan embracing the two or more crimes so related to each other that proof of one tends to establish the other. See Moulton v. State, Okl.Cr., 476 P.2d 366 (1970).

■ We feel the trial court properly admitted the evidence tending to establish the commission of another offense by the defendant as showing a motive of the defendant to commit the crime of perjury. See Vaughn v. State, Okl.Cr., 489 P.2d 507 (1971).

■ The defendant further argues that the trial court erred in failing to instruct the jury on their consideration of the evidence concerning the robbery.

In support of this argument the defendant cites Green v. State, Okl.Cr., 385 P.2d 820 (1963), where the decision of the trial court was reversed because the trial judge failed to explain by proper instruction the reason the testimony of another crime was admitted. However, we feel the case at bar is clearly distinguishable from *Green*, supra. We call attention to the record wherein it states:

"BY MR. WEST: May the Court please, I appreciate your comments, and I would appreciate it if the Court in its very learned way could request of the District Attorney to confine the subject matter to the perjury.

"BY THE COURT: That is what I am trying to do, Mr. West.

"BY MR. GARRETTE: Or the motive therefor, Your Honor.

"BY THE COURT: Motive background, motive as to why the perjury was committed. That's what it is going to, and that is the only reason that we are referring whatsoever anyway about the background of robbery with firearms charge as the motive for the perjury. And that is the only reason for mentioning it. We are not trying him at all in regard to any charge like that." (Tr. 33–34).

In the instant case these excerpts clearly show the admonition of the jury by the trial judge regarding what proper consideration of the evidence in question must be. We do recognize that *Green*, supra, holds that such an admonition should also be given in the general instructions to the jury. However, we feel the record illustrates the trial judge in the instant case *substantially complied* with the established rule of law in *Green*, supra, and thus we disagree with this argument by the defendant.

For the above stated reasons, we find the defendant's second and third propositions of error to be without merit.

■ The defendant's final proposition alleges that the trial court erred in failing to adjudge State's witness, Carl M. Craig, an accomplice whose testimony must be corroborated and that the court erred in failing to instruct in the law of accomplices. In McCormick v. State, Okl.Cr., 464 P.2d 942 (1969) and cited with approval in Farrar v. State, Okl.Cr., 505 P.2d 1355 (1973), this Court held:

" * * * [T]he test by which to determine whether a witness is an accomplice, where his testimony must be corroborated, is to ascertain whether a witness

could be indicted for the offense for which the accused is being tried. * * * "

The facts in the case at bar clearly show that Carl Craig could not have been indicted for the offense for which the accused is being tried and thus the witness does not meet the requirements of the test which would give him the status of an accomplice. Thus, we find the defendant's last proposition of error to be without merit.

In conclusion, we observe the record is free of any error which would justify modification or reversal. The judgment and sentence is accordingly affirmed.

BLISS, P. J., concurs.

BRETT, J., dissents.

BRETT, Judge (dissenting).

I dissent to this decision, because I believe it should be reversed and remanded for a new trial.

First, I believe the record amply supports defendant's contention that he was denied advice of counsel when he was taken to the District Attorney's office for interrogation. Therefore, under the facts presented, I believe defendant's constitutional right to counsel was violated. The majority opinion admits that "each individual has the right to remain silent and to have counsel present at interrogation" but goes on to assume that counsel presented himself at the "Star Chamber" after the interrogation was concluded. I do not understand the record to be that. Mr. Phillips went to the courthouse after Mrs. Hogan called him, soon after they reached the Sheriff's Office.

The Jackson-Denno hearing during trial revealed that Mrs. Hogan called Mr. Fred Phillips to come to the Sheriff's Office to assist her and her husband. Mr. Hogan was already in the District Attorney's Office being interrogated, when she made three telephone calls. She first called two other attorneys, both of whom were not available. Then she called Mr. Phillips. After a discussion with Mrs. Hogan, Mr. Phillips went to the District Attorney's Office, knocked on the door, and asked to talk to Mr. Hogan. Assistant District Attorney Garrette met Mr. Phillips outside the door, talked to him a moment, went back in and had some conversation with Mr. Hogan. He then returned to Mr. Phillips and advised him that Mr. Hogan did not want Mr. Phillips to represent him. Subsequently, to protect himself, Mr. Garrette asserted *that Mr. Phillips had been retained by Mrs. Hogan and was not the attorney for defendant.*

The admissions obtained by the District Attorney under such "Star Chamber" circumstances was the evidence that sustained the conviction.

At the Jackson-Denno hearing, the defendant testified that he did not accept the legal services of Mr. Phillips because he was told not to accept his services by his interrogators. On direct examination, Mr. Hogan related his conversation with Mr. Garrette that night concerning whether or not he should accept the legal assistance of Mr. Phillips, as follows:

"Q. Would you relate to the Court that conversation to the best of your memory?

A. Butch Garrette says, 'There's somebody outside that's awfully nervous.' And I said, 'Why would anybody outside be nervous?' I said, 'I'm the one that's arrested.' And he said, 'Fred Phillips is out there,' and I said, 'There ain't no reason for him to be nervous.' He said, 'Well, do you want him as your lawyer?' he said, 'Wait a minute before you answer this question,' he said 'I want to tell you that you might be in jail and him still walking the streets if you have him as your lawyer.' " (Tr. 148)

At the hearing before Judge Smith on March 12, 1973, Mr. Garrette was asked:

"Q. And do you recall making a statement to Mr. Hogan: 'That if Fred Phillips represented him, that Mr. Hogan would go [to] the penitentiary and Fred Phillips would be walking the streets free?'

A. NOT IN THOSE WORDS, BUT THERE WAS A CONVERSATION TO THAT EFFECT." (Emphasis added.) (Tr. Mar. 12, 1973, p. 76–77).

At page 100 of the March 12th transcript, the District Attorney inquired of Mr. Garrette, on re-cross examination: "Did you ever at anytime threaten to send him (Mr. Hogan) to the penitentiary if he employed Mr. Phillips?" Mr. Garrette replied, "Well, if I did, I didn't mean it that way. He could have taken it that way, I can see why, because we were discussing Fred Phillips quite a bit."

This record is replete with indications that the defendant was coerced into refusing the legal assistance of the attorney engaged by defendant's wife. Defendant was in custodial interrogation and when the attorney engaged by defendant's wife presented himself to consult with the defendant, the attorney should have been permitted to advise his client. But instead, the Assistant District Attorney informed the defendant of the attorney's presence outside and warned him against the attorney in a manner which even the prosecutor himself admitted could have been interpreted as a threat to send defendant to prison if he employed the attorney. (Tr. of Proceedings on March 12, p. 100).

Justice Sutherland stated in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935):

"(A Prosecutor) is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every ligitimate means to bring about a just one."

I believe the actions of the prosecutors were improper and should not be treated so lightly by this Court.

Secondly, I believe the majority opinion misconstrues the law announced in previous decisions of this Court, concerning the limited purpose for admitting evidence of other crimes. In Green v. State, Okl. Cr., 385 P.2d 820 (1963), which was reversed because the jury instruction was not given, this Court quoted from Doser v. State, 88 Okl.Cr. 299, 203 P.2d 451 (1949), which also quoted with approval the statement of law from State v. Rule, 11 Okl.Cr. 237, 144 P. 807 (1914), as follows:

" 'Where evidence is offered tending to prove that the defendant has committed an offense other than that for which he is on trial, good practice requires that the prosecuting attorney should state the purpose for which the evidence is offered, and, if it is admissible for that purpose, the trial court should instruct the jury as to the purpose for which they may consider it.' "

"And the Court added:

'And we are of the opinion that such instruction should be given at the time the evidence is offered as well as that it should be covered in the general instructions at the conclusion of the trial.' "

The majority opinion properly reflects that the trial judge did give an admonition to

the jury when the evidence of the armed robbery was offered. But, the trial judge gave no limiting instruction at the close of the case. The third paragraph to this Court's syllabus to Green v. State, supra, states the following:

"When evidence of other offenses allegedly committed by the accused is offered for the purpose of showing a common scheme, plan or intent, such evidence, to be admissible, must clearly come within the exceptions to general rule that accused must be convicted, if at all, by evidence showing him to be guilty of the offense charged, and when such evidence is admitted, *it is the duty of the trial court in his instructions to the jury to so limit the consideration of such evidence.*" (Emphasis added.)

This has been the rule for many years. If there is a duty imposed on the trial court, as this Court's decisions have heretofore held, then the trial court must give the limiting instruction. "Juries are too prone, when such other offenses are admitted in evidence, to find an accused guilty of the crime charged merely because he might have committed some other offense." Doser v. State, supra, at page 320, 88 Okl.Cr., and page 463, 203 P.2d. The very purpose for requiring the jury instruction is to assure that the jury eliminates from its consideration the evidence of another offense, except as it properly falls within one of the exceptions to the general rule. As I view the rule, the duty to instruct is clearly placed upon the trial court, without any allowance for substantial compliance. The rule clearly requires (1) to admonish the jury when the evidence is offered; and (2) to properly instruct the jury at the close of the case.

Therefore, I feel compelled to dissent to this decision for the foregoing stated reasons, and believe this conviction should receive the same treatment this Court gave in Green v. State, supra, i. e. this conviction should be reversed and remanded for a new trial.